**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | | |
|---|---|---|
| PAUL DAVIS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| | § | CIVIL ACTION NO. 4:22-CV-01001 |
| TIKTOK INC. and | § | |
| META PLATFORMS, INC. | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |

**DEFENDANT META PLATFORMS, INC.'S**
**<u>MOTION TO DISMISS UNDER RULE 12(b)</u>**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      **Introduction** ................................................................................................................ **1**

II.     **Background** .................................................................................................................. **2**

    A.      Meta and Its Online Services ................................................................................ 2

    B.      Texas' Efforts to Curtail Meta's Editorial Judgments ........................................... 3

    C.      Davis' Lawsuit ...................................................................................................... 5

III.    **Statement of Issues** ..................................................................................................... **6**

IV.     **Argument** ..................................................................................................................... **7**

    A.      The Complaint Fails to State a Claim ................................................................... 7

    B.      Even if the Complaint Stated a Claim, Federal Law Would Bar It ..................... 14

    C.      The Court Lacks Personal Jurisdiction Over Meta .............................................. 27

V.      **Conclusion** ................................................................................................................. **30**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ark. Writers' Project, Inc. v. Ragland,*
    481 U.S. 221 (1987)................................................................22, 23, 25

*Buckley v. Valeo,*
    424 U.S. 1 (1976)...........................................................................23, 25

*Citizens United v. Fed. Election Comm'n,*
    558 U.S. 310 (2010)..............................................................................21

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014)........................................................................27, 28

*Daniels v. Alphabet Inc.,*
    2021 WL 1222166 (N.D. Cal. 2021) ..............................................12, 27

*Dennis v. Zuckerberg,*
    2017 WL 3873761 (N.D. Ohio Sept. 5, 2017)......................................30

*Doe v. MySpace, Inc.,*
    474 F. Supp. 2d 843 (W.D. Tex. 2007)...........................................12, 13

*Doe v. MySpace, Inc.,*
    528 F.3d 413 (5th Cir. 2008) .....................................................11, 14, 27

*Domen v. Vimeo, Inc.,*
    433 F. Supp. 3d 592 (S.D.N.Y. 2020)........................................11, 12, 27

*In re Facebook, Inc.,*
    625 S.W.3d 80 (Tex. 2021)........................................................11, 27

*FTC v. Match Grp.,*
    2022 WL 877107 (N.D. Tex. Mar. 24, 2022) ............................11, 12, 27

*Georgalis v. Facebook, Inc.,*
    324 F. Supp. 3d 955 (N.D. Ohio 2018)................................................29

*Gullen v. Facebook.com, Inc.,*
    2016 WL 245910 (N.D. Ill. Jan. 21, 2016) ..........................................29

*Harrison v. Facebook, Inc.,*
    2019 WL 1090779 (S.D. Ala. Jan. 17, 2019) ......................................30

*Head v. Las Vegas Sands, LLC,*
  298 F. Supp. 3d 963 (S.D. Tex. 2018) ...................................................................28

*Hornsby v. Fish Meal Co.,*
  431 F.2d 865 (5th Cir. 1970) ...................................................................................2

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
  515 U.S. 557 (1995).......................................................................................21, 24

*Johnson v. TheHuffingtonPost.com, Inc.,*
  21 F.4th 314 (5th Cir. 2021) ..................................................................................29

*KeyCity Cap., LLC v. Davenport Invs., LLC,*
  2022 WL 581146 (N.D. Tex. Feb. 25, 2022)............................................................1

*Knowles v. City of Waco, Tex.,*
  462 F.3d 430 (5th Cir. 2006) .................................................................................24

*La'Tiejira v. Facebook, Inc.,*
  272 F. Supp. 3d 981 (S.D. Tex. 2017) ......................................................11, 21, 27

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
  138 S. Ct. 1719 (2018) ...........................................................................................22

*McCutcheon v. FEC,*
  572 U.S. 185 (2014).................................................................................................25

*Mezey v. Twitter, Inc.,*
  2018 WL 5306769 (S.D. Fla. July 19, 2018) .........................................................27

*Miami Herald Publ'g Co. v. Tornillo,*
  418 U.S. 241 (1974).................................................................................................24

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue,*
  460 U.S. 575 (1983)...........................................................................................22, 25

*NetChoice, LLC v. Att'y Gen., Fla.,*
  34 F.4th 1196 (11th Cir. 2022) ................................................................................2

*NetChoice, LLC v. Paxton,*
  142 S. Ct. 1715 (2022)..........................................................................................5, 7

*NetChoice, LLC v. Paxton,*
  49 F.4th 439 (2022)....................................................................................... *passim*

*NIFLA v. Becerra,*
  138 S. Ct. 2361 (2018) .................................................................................21, 22, 25

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*,
  475 U.S. 1 (1986) ...........................................................................................23

*Ralls v. Facebook*,
  221 F. Supp. 3d 1237 (W.D. Wash. 2016) ............................................................30

*Ranger Conveying & Supply Co. v. Davis*,
  254 S.W.3d 471 (Tex. App. 2007)........................................................................10

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015).........................................................................21, 22, 23, 24

*Sikhs for Justice, Inc. v. Facebook, Inc.*,
  697 F. App'x 526 (9th Cir. 2017) .........................................................................27

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011)....................................................................................22, 23

*Texas v. White*,
  74 U.S. 700 (1868) ...........................................................................................12

*W.V. State Bd. of Educ. v. Barnette*,
  319 U.S. 624 (1943)..........................................................................................24

*Walden v. Fiore*,
  571 U.S. 277 (2014).................................................................................27, 28, 29, 30

*Wells v. Facebook Inc.*,
  2019 WL 6894681 (D. Kan. Dec. 18, 2019)............................................................30

*Wooley v. Maynard*,
  430 U.S. 705 (1977)..........................................................................................21

*Word of God Fellowship, Inc. v. Vimeo, Inc.*,
  205 A.D.3d 23 (N.Y. App. Div. 2022) ..............................................................12, 27

*Zhang v. Baidu.com*,
  10 F. Supp. 3d 433 (S.D.N.Y. 2014).....................................................................21

**Statutes**

47 U.S.C. §230......................................................................................... *passim*

Tex. Civ. Prac. & Rem. Code §143A.001 ............................................... *passim*

Tex. Civ. Prac. & Rem. Code §143A.004 ............................................... *passim*

Tex. Civ. Prac. & Rem. Code §143A.006 ............................................... *passim*

Tex. Civ. Prac. & Rem. Code §143A.007 .............................................................. *passim*

Tex. Bus. & Com. Code § 120.001(1)(C)(i) ...............................................................23

## I.      INTRODUCTION

Plaintiff Paul Davis seeks to control the editorial judgments of an out-of-state online-service provider to enhance his social-media presence, promote his business, and shield himself from online criticism.  These demands are addressed to the wrong Court.  As Defendant Meta Platforms, Inc. explained in its pending motion to transfer, Davis agreed to multiple forum-selection clauses that required him to sue in California.  ECF 20.  Transfer is a "threshold ground[] for denying audience to a case on the merits," meaning the Court should do nothing more than send this case to where it has always belonged.  *KeyCity Cap., LLC v. Davenport Invs., LLC*, 2022 WL 581146, at *2 (N.D. Tex. Feb. 25, 2022) (quotation omitted).

But even on the merits, the complaint fails as a matter of law for several reasons and should be dismissed with prejudice.  First, although Davis repeatedly offers the legal conclusion that Meta "censored" him in violation of Chapter 143A of the Texas Civil Practice and Remedies Code ("TCPRC"), the factual allegations show no such thing.  In many instances, Davis simply has not alleged facts creating a plausible inference of ***viewpoint***-based discrimination, which is his sole theory.  And even when he tries to allege facts, they do not state a viable claim under the statute, which does not apply when (as here) a plaintiff seeks to avoid online criticism or attack moderation decisions authorized by the federal law enmeshed in Chapter 143A.  Davis has not alleged an actionable "violat[ion]" under Chapter 143A's "narrow remedial scheme," so his suit fails at the outset.  TCPRC §143A.007(a); *NetChoice LLC v. Paxton*, 49 F.4th 439, 446 (5th Cir. 2022).

Second, even if Davis had alleged a violation under Chapter 143A (and the federal-law standards it incorporates), several doctrines would immediately bar his complaint.  The Commerce Clause forbids using Texas law to regulate Meta's California decisions about how to operate its nationwide services.  The First Amendment prohibits Davis from compelling Meta to prioritize his content and muzzle his critics.  The vagueness doctrine renders Chapter 143A unenforceable.  And

the federal Communications Decency Act ("CDA") forecloses Davis' proposed interference with Meta's moderation of Facebook and Instagram.

Third, a Texas court cannot exercise personal jurisdiction over Meta in this litigation. Davis alleges that "all" supposed wrongdoing occurred in "California" and that the only contacts between this suit and Texas are contacts created by him—not Meta.  ECF 5 ("Compl.") ¶13.

To be clear, Meta acknowledges that a fractured Fifth Circuit panel recently upheld Chapter 143A against a facial First Amendment challenge.  *NetChoice*, 49 F.4th 439.  But that decision—which only declined to categorically bar enforcement of the law against "anyone at any time and under any circumstances" "before it ha[d] been applied"—said nothing about several of Meta's arguments and is readily distinguishable (or proves Meta's point) on others.  *Id.* at 444, 448, 451, 489 & n.3.  Regardless, the Fifth Circuit stayed its mandate pending the Supreme Court's likely review in either *NetChoice* itself, or in a parallel Eleventh Circuit case that unanimously found constitutional defects in a similar Florida law.  ECF 1-7 (stay order); *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196 (11th Cir. 2022).  So, even if this Court were to deny Meta's threshold motion to transfer ***and*** rule against Meta on all its other dispositive arguments for dismissal, the Court should reserve judgment on the balance of the case and stay proceedings until the Supreme Court speaks.  *See Hornsby v. Fish Meal Co.*, 431 F.2d 865, 866 & n.1 (5th Cir. 1970).

## II.     BACKGROUND

### A.     Meta and Its Online Services

Meta operates a variety of online services and applications, including Facebook and Instagram.  Both services allow users to create, share, and interact with online content.  This content is diverse and substantial:  It is generated by billions of users located throughout the world, uploaded in a variety of media formats, and spans substantively the entire range of human thought—from the creative, humorous, and political, to the offensive and controversial.

Because of the sheer volume and breadth of this third-party content, Meta has invested significant resources into developing rules and standards to moderate and organize the user-created content for publication on its services.  Although "Meta wants people to be able to talk openly about the issues that matter to them," it also recognizes that "the internet creates new and increased opportunities for abuse."  Meta Transparency Center, *Facebook Community Standards* (last visited May 16, 2023), http://bit.ly/3tdKbtn.  Meta thus restricts several types of content that it deems objectionable, such as bullying and harassment.  *E.g.*, *id.*, *Bullying and Harassment* (last visited May 16, 2023), http://bit.ly/3phMEBJ.  Those policies are explained in Facebook's Community Standards and Instagram's Community Guidelines, which users agree to follow.

### B.    Texas' Efforts to Curtail Meta's Editorial Judgments

Meta makes billions of editorial decisions each day, so it is inevitable that some people will disagree with Meta's judgments and criticize them.  Others will agree with them and praise them.  The First Amendment and its preference for debate expect nothing less.

But in late 2021, Texas took a different tack.  Rather than construct a government forum to create new avenues for speech—an approach the Legislature rejected—it enacted Chapter 143A to punish Meta and a few other California-based companies for enforcing their private standards.  *See* Tex. H.R. Journal, 87th Leg., 2d Spec. Sess. at 234 (2021), http://bit.ly/3t2JgLw.  Relevant here, the law says that select "social media platform[s]" in some cases may not "censor"—*i.e.*, "block, ban, remove, deplatform, demonetize, de-boost, restrict, [or] deny equal access or visibility to"—"a user, a user's expression, or a user's ability to receive the expression of another person based on … the viewpoint of the user or another person."  TCPRC §§143A.001(1), .002(a).  Not all restrictions are prohibited, however; Chapter 143A does not apply to many types of so-called "censorship," including when federal law authorizes the restriction.  *Id.* §143A.006 ("Construction of Chapter"); *see also id.* §143A.004 ("Applicability of Chapter").  But a user who can nonetheless

"prove[] that [a] social media platform violated th[e law] with respect to the user" may sue. *Id.* §143A.007(a), (b).

Texas did not conceal its motivation for the law:  to target disfavored social-media services for exercising their editorial judgment, and in particular for exercising their judgment outside of Texas.  Senator Bryan Hughes, who sponsored the bill, claimed that it would eliminate "Silicon Valley censorship."  Meta Ex. 1, Sen. Bryan Hughes (@SenBryanHughes), Twitter (Mar. 6, 2021, 4:48 AM), http://bit.ly/3HIVYbX.   Governor Abbott—while signing the Act into law—claimed that "there is a dangerous movement by social media companies to silence conservative viewpoints and ideas."  Meta Ex. 2, Gov. Abbott Signs Law Protecting Texans From Wrongful Social Media Censorship (Sept. 9, 2021), http://bit.ly/3jcldsQ.   And Senator Hughes further tweeted that "Texans must be able to speak without being censored by West Coast oligarchs."  Meta Ex. 3, Sen. Bryan Hughes (@SenBryanHughes), Twitter (Aug. 9, 2021, 9:34 PM), http://bit.ly/3v2fY1r.

The text of the law reflects this targeting.  It singles out social-media services with 50 million monthly active users, such as Facebook, Twitter, and YouTube, for disfavored treatment. TCPRC §143A.004(c).  At the same time, it does not include preferred speakers like Parler and Gab (indeed, the Legislature rejected an amendment that would have covered them),[1] and it excludes services that focus on "news, sports, [and] entertainment."  *Id.* §143A.001(4); Tex. Bus. & Com. Code §120.001(1)(C)(i).   Chapter 143A also reaches beyond the borders of Texas to ensure that West Coast services are brought to heel.  *E.g.*, TCPRC §143A.004.

---

[1]   Tex. H.R. Journal, 87th Leg. at 497-99 (2021), http://bit.ly/3Cq663o; Shawn Mulcahy, *Texas Senate approves bill to stop social media companies from banning Texans for political views*, Texas Tribune (updated April 1, 2021), http://bit.ly/3nU2ceV.  The Court may take notice of all "matters of public record" Meta cites.  *Lewis v. Wells Fargo Bank, N.A.*, 939 F. Supp. 2d 634, 637 & n.3 (N.D. Tex. 2013).

As things stand, the Western District of Texas entered a preliminary injunction against the law over a year ago.  The injunction remains in place—despite two interventions by the Fifth Circuit—because the Supreme Court vacated the Fifth Circuit's initial stay, and the Fifth Circuit stayed its most recent divided opinion vacating the injunction pending another round of Supreme Court review.  *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1117 (W.D. Tex. 2021), *vac. & rem'd* 49 F.4th 439, *stayed by* Order of Oct. 12, 2022 (ECF 1-7); *NetChoice, LLC v. Paxton*, 142 S. Ct. 1715 (2022), *vacating stay granted in* 2022 WL 1537249 (5th Cir. May 11, 2022).

### C.   Davis' Lawsuit

Davis is a Facebook and Instagram user who alleges that Meta recently began discriminating against him on the basis of viewpoint.  Compl. ¶¶14-15.  According to the complaint, when Davis "express[ed]" unspecified "viewpoints related to the January 6th protests at the US Capitol," Meta "suddenly banned" him from Facebook and Instagram.  *Id.* ¶14.

Davis then "started new Facebook and Instagram accounts in February or March of 2021," the "primary purpose of [which] was to promote [his] law firm practice."  *Id.* ¶¶15-16.  He does ***not*** allege that Meta has banned these accounts too—indeed, the complaint indicates that both remain active.  Rather, Davis believes that Meta has at times caused these new accounts to perform poorly.  He says, for example, that he has experienced drops in "his Instagram story views" and "daily number of new followers," both of which supposedly show "that Meta ha[s] put restrictions on [his] account by reducing its exposure in [Meta's] viewership algorithms."  *Id.* ¶¶22-23.  He similarly alleges that someone he met at a conference was "unable to locate [his] account in the Instagram search function," that his online followers "had to refollow him," and that other users self-reported difficulties interacting with his posts.  *Id.* ¶¶23-25.  These supposed fluctuations in Davis' popularity, however, are transient and largely unmoored from specific content he posted.  In fact, he admits that "his account w[ent] suddenly back to normal" and that his "story views,"

"followers," and "likes on his posts went back to pre[vious] levels"—the sort of variation that any social-media user might expect.  *Id.* ¶26.

Indeed, the Complaint only sporadically attempts to link Davis' specific online activities to the viewership and reception of his social-media presence.  <u>First</u>, Davis alleges that when he "posted a video" speculating that the "actress Anne Heche … could have been murdered because of her work related to exposing child sex trafficking," a "third-party fact-checker[]" "plac[ed] a label on [the video] stating that it was 'False.'"  *Id.* ¶27.  <u>Second</u>, after Davis made an Instagram livestream about COVID, he received notifications that his account had "posted false information" and that "[r]estrictions w[ould] apply to [his] account for 90 days"—though he declines to say what those "[r]estrictions" were.  *Id.* ¶29.  <u>Third</u>, when Davis "attempted to post a link" on Facebook to the website of the Texas Nationalist Movement—a group that advocates secession from the Union—Meta ostensibly prevented him from sharing that link.  *Id.* ¶35.

Based on these allegations, Davis concludes that Meta has "censored" him "because of his viewpoints in violation of Chapter 143A."  *Id.* ¶¶1, 52, 56.  He filed a since-removed complaint in Collin County, Texas, despite having previously agreed to litigate only in California and despite claiming that "all" purported "censorship [was] perpetrated against [him]" from "California."  *Id.* ¶13; *see also* ECF 20 (Meta's Motion to Transfer).  Davis sought an injunction, a declaratory judgment, attorney's fees, and "daily [monetary] penalties … which double[] every day."  Compl. ¶¶54, 58, 63, 64.  He also asked for a "temporary restraining order" to restore his "fundament[al] right to free speech" and prevent "irreparabl[e] harm[]" to his law practice, the "promot[ion]" of which is "[t]he primary purpose" of his "social media accounts."  *Id.* ¶¶16, 68, 70.

## III.  STATEMENT OF ISSUES

1.   Whether the Court, if it denies Meta's motion to transfer, should dismiss the complaint for failure to state a claim.

2.      Whether the Court should dismiss this case for lack of personal jurisdiction.

## IV.    ARGUMENT

Were the Court to reach a complaint that Davis filed in the wrong state, dismissal would be necessary for three independent reasons.  <u>First</u>, the complaint fails at the outset to state a claim for viewpoint discrimination under Chapter 143A's narrow private cause of action and the federal law it incorporates.  <u>Second</u>, even if the complaint alleged a plausible claim, other doctrines would bar it.  <u>Third</u>, the complaint fails to establish personal jurisdiction over Meta in Texas, but rather solely and expressly objects to decisions that a California company made in California.

### A.      The Complaint Fails to State a Claim

The complaint does not state an actionable claim for viewpoint discrimination under the very statute it invokes.  As Davis admits, Chapter 143A's private cause of action requires a plaintiff to show "that the social media platform ***violated*** this chapter with respect to the user."  TCPRC §143A.007 (emphasis added); Compl. ¶43.  To establish that "violat[ion]," a plaintiff must start by alleging—as Davis asserts here—that the defendant restricted content "based on … viewpoint." TCPRC §143A.002; Compl. ¶¶1-2, 29.  These allegations must include "sufficient" "factual enhancement" to "allow[] the court to draw the reasonable inference that the defendant" actually engaged in viewpoint discrimination.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[F]acts that are merely consistent with" such "discrimination" are insufficient, especially when they fail to consider "more likely explanations" for the plaintiff's accusations.  *Id*. at 678, 681.

Here, the bulk of the factual allegations come nowhere close to pleading viewpoint-based discrimination for the simple reason that the complaint says nothing about the at-issue viewpoints. Take, for example, Davis' lead claim that Meta "banned" his original Facebook and Instagram accounts "for expressing his viewpoints related to the January 6th protests at the US Capitol." Compl. ¶14.  Notably, the ***complaint does not allege what those viewpoints were***.  Davis might

7

have been criticizing the riots.  Or he might have been encouraging the riots.   The complaint fails to specify.  Needless to say, a plaintiff cannot plausibly allege viewpoint discrimination without describing the viewpoint at issue.[2]

Davis' other allegations are similarly lacking in facts plausibly showing viewpoint discrimination.  For example, Davis surmises that because his viewership, user-engagement, and online prominence has fluctuated at times, "there [is] no explanation … other than that Meta … put restrictions on [his] account."  Compl. ¶23.  But Davis does not connect these fluctuations to the actual content and viewpoints he posted, meaning he has not pleaded the specific type of discrimination essential to his claims under Chapter 143A.  Moreover, Davis' allegation that his viewership and user engagement have varied over time is exactly what *any* social-media user might expect based on the frequency of their posts or the interests of the followers (and non-followers) who engage with their content.  Compl. ¶26.  For that reason too, Davis' charge of discrimination falters in light of the "more likely explanation[]" that his accounts have sometimes plateaued or performed poorly for other reasons—such as his viewers becoming tired of his content, or other content-creators overshadowing his one-time popularity.  *Iqbal*, 556 U.S. at 681.

This unmet need to describe the at-issue viewpoint and content is not a technicality.  In the words of *NetChoice*, Chapter 143A "provides a narrow remedial scheme" that prohibits only some types of "viewpoint-based censorship" while "expressly permit[ting services] to censor *any* unlawful expression[,] certain speech that 'incites criminal activity or consists of specific threats,' [and] *any* content the [services] are authorized to censor by federal law."  49 F.4th at 446, 452

---

[2]   This theory independently fails because Meta allegedly banned Davis' original accounts in January 2021, but Chapter 143A "applies only to a cause of action that accrues *on or after* the effective date of th[e] Act" in December 2021.  TCPRC §143A.001 (§9 Note) (emphasis added); *compare* Compl. ¶14, *with id.* ¶39.

(emphases added).  Davis thus cannot decline to say, for example, what he posted about the January 6 riots; this vagueness not only prevents him from alleging viewpoint-based discrimination in the first instance, but leaves no way to assess whether his posts incited violence or were otherwise subject to restriction under the federal law that Chapter 143A incorporates.  *See, e.g.*, 18 U.S.C. §2385 (prohibiting "advoca[cy]" for the "overthrowing or destroying [of] the government of the United States or the government of any State").  So too for Davis' allusions toward unspecified "viewpoints" that supposedly resulted in fluctuations in his online popularity.  Compl. ¶22. Chapter 143A does not allow suit anytime a social-media user is dissatisfied with "the number of likes" they receive.  Compl. ¶53.  The law is not a guarantee that once-popular users will always capture the interest of their fans, but rather requires factual allegations of viewpoint discrimination that both account for other potential "explanations" and show that the at-issue content falls within Chapter 143A and its federally defined boundaries.  *Iqbal*, 556 U.S. at 678, 681.

To be sure, some of Davis' allegations do refer to specific content he has shared—like his videos discussing the death of Anne Heche and COVID—but they get him no closer to stating a plausible claim.  Compl. ¶¶27, 29.  The reason is simple.  Davis' grievance on this score is that "third-party 'fact-checkers'" appended ***their own*** commentary to his videos in the form of "fact-check" notices, but nothing in Chapter 143A allows a plaintiff to sue a social-media service over third-party content.  Compl. ¶¶27, 29.[3]  And, even assuming for the sake of argument that the third-party fact-checks could be attributed to Meta, the Fifth Circuit has said that Chapter 143A leaves

---

[3]   Davis suggests that these "fact checks" were followed by "restrictions," but he never describes those "restrictions" and thus offers no facts showing how he actually was subjected to viewpoint discrimination.  Compl. ¶29.  He also fails to account for the reality that there are "more likely explanations" for any decrease in viewer engagement, such as diminished viewer interest, user skepticism of Davis' claims, and the increasing popularity of other content-creators.  *Iqbal*, 556 U.S. at 681; Compl. ¶28.

Meta free to post "an addendum to any content or material posted by a user," to "say whatever [it] want[s] … about any post by any user," and "to distance [itself] from [user] speech." *NetChoice*, 49 F.4th at 454, 462, 489 (emphasis added).  Davis cannot use Texas law to silence his critics.

Finally, Davis' allegation that Meta prevented him from "post[ing] a link" to the website of a secessionist organization fails to plausibly allege that Meta "***violated*** … [C]hapter [143A] with respect to [Davis']" under the law's "narrow remedial scheme."  TCPRC §143A.007 (emphasis added); *NetChoice*, 49 F.4th at 446.  Again, Chapter 143A "contains several qualifications" and "***expressly permits*** [Meta] to censor"—among other things—"any content [it is] authorized to censor by federal law."  *NetChoice*, 49 F.4th at 446, 452 (emphasis added); TCPRC §§143A.004, .006 (limiting the law's "applicability" and "construction").  Davis thus cannot plead the substantive "violat[ion]" necessary to his cause of action without establishing that federal law does not "specifically authorize[]" the alleged censorship.  TCPRC §§143A.006(a)(1), .007(b); *see, e.g.*, *Ranger Conveying & Supply Co. v. Davis*, 254 S.W.3d 471, 478 (Tex. App. 2007) ("The burden is on a plaintiff to prove the existence and ***violation*** of a legal duty owed by the defendant …." (emphasis added)).

Davis' allegations about the secessionist link fall short.  Far from showing—as he must—that no federal law authorized Meta to implement the alleged restrictions, Davis actually confirms that federal law twice-over allowed Meta to prevent users from sharing the link.  He therefore, once again, has not stated an actionable claim for a "violat[ion]."  TCPRC §143A.007(b).[4]

First, subsection (c)(1) of the CDA allows a social-media service to restrict content that the service itself did not generate.  47 U.S.C. §230(c)(1).  "At its core," this provision entitles a service

---

[4]   The federal-authorization component of Chapter 143A also means that Davis' other allegations—supposing they were sufficient to show viewpoint discrimination to begin with— would fail to state an actionable "violation" for similar reasons.  TCPRC §143A.007.

to engage in "a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content." *La'Tiejira v. Facebook, Inc.*, 272 F. Supp. 3d 981, 992 (S.D. Tex. 2017) (quotation omitted).  This authorization applies "broadly in all cases arising from the publication of user-generated content." *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008); *accord FTC v. Match Grp.*, 2022 WL 877107, at *8 (N.D. Tex. Mar. 24, 2022).  All that is required is that (1) the defendant is the provider of an "interactive computer service"; (2) the lawsuit addresses the defendant's "publisher[]" activities—such as "the monitoring, screening, and deletion of user-generated content"; and (3) the content at issue was not "authored or created" by the defendant itself.  *La'Tiejira*, 272 F. Supp. 3d at 993-94 (emphasis omitted) (collecting cases).

This authorization to screen content squarely permitted Meta to restrict Davis from sharing materials like the secessionist link.  There is no dispute that Meta's "Facebook['s] [service] satisfies the definition for [an] 'interactive computer service.'" *Id.*  The complaint further alleges that Meta engaged in the "publisher[]" activities of "screening" this link.  *Id.* at 993; Compl. ¶35; *see also In re Facebook, Inc.*, 625 S.W.3d 80, 94 n.9 (Tex. 2021) (Facebook's "editorial decision[s]" include "warnings, flagging of messages, or who may establish an account"); *Match*, 2022 WL 877107, at *8 ("[s]creening, blocking, monitoring, or editing allegedly harmful third-party content falls within a publisher's traditional editorial functions" (quotation omitted)); *Domen v. Vimeo, Inc.*, 433 F. Supp. 3d 592, 602 (S.D.N.Y. 2020) ("Vimeo plainly was acting as a 'publisher' when it deleted … Plaintiffs' content").  And the complaint indicates that this link was not "created or authored" by Meta, but rather created by the Texas Nationalist Movement before Davis attempted to disseminate it on Facebook.  *La'Tiejira*, 272 F. Supp. 3d at 993; Compl. ¶35. Subsection (c)(1) thus "authorized" Meta to restrict the link, meaning that Davis has not pleaded a "violat[ion]" of Chapter 143A.  TCPRC §§143A.006(a)(1), .007(b).

Second, and independently, subsection (c)(2) of the CDA authorizes the "provider … of an interactive computer service" to prohibit "material that [it] considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."   47 U.S.C. §230(c)(2)(A).   Courts routinely invoke this provision to dismiss claims of censorship.  *E.g.*, *Domen*, 433 F. Supp. 3d at 603 (termination of access based on content of videos); *Daniels v. Alphabet Inc.*, 2021 WL 1222166, at *12-13 (N.D. Cal. Mar. 31, 2021); *Word of God Fellowship, Inc. v. Vimeo, Inc.*, 205 A.D.3d 23, 27-28 (N.Y. App. Div. 2022) (collecting cases).[5]

Here, the complaint illustrates Meta's federally derived authority to restrict the link on this basis, meaning that Davis has not alleged a "violat[ion]."  TCPRC §§143A.006(a)(1), .007(b).  In fact, Davis pleads himself out of court by claiming that Meta restricted the link because it "violated [Meta's] 'Community Standards,'" Compl. ¶35—which is just another way of saying that Meta "applied its [g]uidelines" to restrict Davis' content and "attempted to comply with its Acceptable Use Policy."  *Domen*, 433 F. Supp. 3d at 604; *Word of God*, 205 A.D.3d at 30.  There also is no question that the link promotes Texas' secession from the Union—an end that the Supreme Court has said would violate the Constitution.   *E.g.*, *Texas v. White*, 74 U.S. 700, 725 (1868) ("Considered therefore as transactions under the Constitution, the ordinance of secession … and all the acts of her legislature intended to give effect to that ordinance, were absolutely null.").  Under any fair interpretation of the phrase "otherwise objectionable," 47 U.S.C. §230(c)(2)(A), Meta was "authorized" to restrict secessionist content on its Facebook website, and thus Davis has not pleaded the "violat[ion]" required to state a claim.  TCPRC §§143A.006(a)(1), .007(b).

---

[5]   *See also Match*, 2022 WL 877107, at *11 ("Match is entitled to immunity for liability stemming from its actions (or inaction) in reviewing user accounts sending communications."); *Doe v. MySpace, Inc.*, 474 F. Supp. 2d 843, 850 (W.D. Tex. 2007) ("the CDA also immunizes such services from liability based on efforts to self-regulate material").

To be sure, the Fifth Circuit's take on the *NetChoice* litigation proposed a narrower view of the CDA, albeit in the context of resolving a facial First Amendment challenge.  *See* 49 F.4th at 465-69.  But for several independent reasons, that since-stayed opinion—which did not attempt to determine how Chapter 143A would apply to specific cases given the statute's "express[] permi[ssion]" to restrict "any content the Platforms are authorized to censor"—does not change that Meta was entitled to block the link in ***this*** case.  *Id.* at 452.

<u>First</u>, *NetChoice*'s limited observations about the scope of the CDA rested on the Court's recurring premise that the *NetChoice* challengers were ***not*** engaging in "editorial discretion" because they were simply making "*ex post*" decisions to remove content, instead of performing the sort of "*ex ante* review that typifies 'editorial discretion'" and is akin to the "*ex ante* curation [by] newspapers … that enjoys constitutional protection."  *Id.* at 465 & n.18.[6]  Here, by sharp contrast, Davis alleges that Meta made an *ex ante* decision to prevent his "***attempt[]*** to post a link to TEXITnow.org."  Compl. ¶35 (emphasis added).  This claim involves the exact sort of upfront editorial judgment that the CDA authorizes.

<u>Second</u>, *NetChoice*'s analysis rested on the premise that "§230 [of the CDA] is nothing more (or less) than a statutory patch to a gap in the First Amendment's free speech guarantee" that protects social-media services from "[d]efamation liability."  *Id.* at 467; *accord id.* at 466 ("Congress enacted Section 230 … to [address] defamation liability").  That narrow view,

---

[6]   *See also, e.g.*, *NetChoice*, 49 F.4th at 465 ("[t]he Platforms do not choose or select material before transmitting it"); *id.* at 465 n.18 ("If the Platforms wanted the same protections [as newspapers], they could've used the same *ex ante* curation process."); *id.* at 483 ("The Platforms do not exercise the same editorial discretion and control that cable operators do— for example, they do not make *ex ante* decisions …."); *id.* at 488 ("the Platforms, of course, neither select, compose, nor edit (except in rare instances ***after*** dissemination)"); *id.* at 460 n.9 (recognizing possible distinctions in how services operate, but dismissing them as irrelevant in the context of a facial challenge).

however, cannot be squared with the Fifth Circuit's previous holding in *MySpace* that §230 applies to other sorts of claims beyond defamation.  528 F.3d at 418; *see also id.* (recognizing that "Courts have construed the immunity provisions in §230 broadly in all cases").  Because the Fifth Circuit "adheres strictly to the maxim that one panel of the court cannot overturn another, even if it disagrees with the prior panel's holding," *Macktal v. U.S. Dep't of Lab.*, 171 F.3d 323, 328 (5th Cir. 1999), the "earlier" decision in *MySpace* "controls" this case.  *Meditrust Fin. Servs. Corp. v. Sterling Chem., Inc.*, 168 F.3d 211, 214 n.4 (5th Cir. 1999).

*     *     *

It was Davis' burden to allege that Meta actually "violat[ed]" Chapter 143A.  TCPRC §143A.007.  That task required him to plead facts plausibly showing that Meta engaged in "viewpoint" discrimination—an inquiry that must take into consideration "more likely explanations" for Davis' dissatisfaction with the performance of his accounts.  *Iqbal*, 556 U.S. at 681.  That task also required him to plead that Meta's alleged decisions actually amounted to a "violat[ion]" when measured against the federal law incorporated into Chapter 143A.  TCPRC §§143A.006, .007.  The complaint falls short at every turn, and so the Court should dismiss it.

### B.    Even if the Complaint Stated a Claim, Federal Law Would Bar It

The Court need go no further to dismiss the complaint; indeed, the threshold forum-selection issue means the Court should not address the complaint at all.  But could there be any doubt this litigation is futile, Davis' underlying legal theory—that Chapter 143A is a vehicle for controlling Meta's out-of-state editorial judgments—is defective as a matter of law under the Commerce Clause, the First Amendment, the Vagueness Doctrine, and the CDA.

#### 1.    The Commerce Clause requires dismissal

The Commerce Clause prevents Texas law from controlling Meta's decisions regarding Facebook and Instagram.  While a literal reading of this Clause reflects "a grant of regulatory

14

power to Congress," it also limits the powers of the states in several respects. *Or. Waste Sys., Inc. v. Dep't of Env't Quality of Or.*, 511 U.S. 93, 98 (1994). First, although States may engage in "***incidental*** regulation of interstate commerce," "direct regulation is prohibited." *Edgar v. MITE Corp.*, 457 U.S. 624, 640 (1982) (plurality op.); *accord Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986). This rule forbids "inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State." *Healy v. Beer Inst.*, 491 U.S. 324, 337 (1989); *accord Edgar*, 457 U.S. at 642 (plurality op.). Second, "even when a state statute regulates interstate commerce indirectly, the burden imposed on that commerce must not be excessive in relation to the local interests served." *Edgar*, 457 U.S. at 643 (maj. op.). Third, "[w]hen a state statute … discriminates against interstate commerce," courts "generally str[ike] down the statute without further inquiry." *Brown-Forman*, 476 U.S. at 579.[7]

Chapter 143A violates each of these rules. First, the law "directly regulates" activity "that takes place wholly outside of [Texas'] borders" and "project[s Texas'] regulatory regime into the jurisdiction of another State"—indeed, several other States. *Id.*; *Edgar*, 457 U.S. at 642 (plurality op.); *Healy*, 491 U.S. at 337. To give just one example, the law addresses not only content shared by Texas-based users, but ***also*** forbids moderation of content if doing so impacts the "ability" of Texas users "to ***receive*** the expression of another person"—even if that other person is outside of Texas. TCPRC §§143A.002, .004 ("shared ***or*** received in this state") (emphases added). In other words, a social-media service should assume that every piece of content its users share—wherever they are located and whomever their intended audiences—might nonetheless be "receive[d]" by a

---

[7]   The Commerce Clause fully applies to state-law efforts to regulate online content. *See, e.g.*, *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 102-04 (2d Cir. 2003) (rejecting law that prohibited distribution of explicit materials to minors); *Am. Civ. Liberties Union v. Johnson*, 194 F.3d 1149, 1161 & n.9 (10th Cir. 1999) (similar).

Texan, and thus subject to Chapter 143A.  *Id.*  The Commerce Clause, however, does not allow Texas to regulate these out-of-state activities, "whether or not" Texas believes that these activities may "ha[ve] effects within the State."  *Edgar*, 457 U.S. at 642-43 (plurality op.) (rejecting an "Illinois law, [that] unless complied with, sought to prevent [an out-of-state company] from making its [tender] offer [for an Illinois company] and concluding interstate transactions not only with … stockholders living in Illinois, but also with those living in other States and having no connection with Illinois").[8]

This regulation of online activities is especially problematic in light of the principle that the "Commerce Clause protects against inconsistent legislation," meaning courts must ask "what effect would arise if not one, but many or every State adopted similar legislation"?  *Healey*, 491 at 336-37.  The answer here is obvious: "Balkanization."  *Or. Waste*, 511 U.S. at 98.  After all, "if [Texas] may impose such regulations, so may other States."  *Edgar*, 457 U.S. at 642 (plurality op).  Worse yet, that Balkanization would be of an internet the Fifth Circuit has said is a key "means of interstate commerce" "premised on the lack of territorial limits."  *U.S. v. Barlow*, 568 F.3d 215, 220 (5th Cir. 2009); *Admar Int'l, Inc. v. Eastrock, LLC*, 18 F.4th 783, 788 (5th Cir. 2021).

Indeed, the battle is already brewing.  "Lawmakers in 34 red and blue states" "have introduced more than 100 bills in the past year aiming to regulate how social media companies such as Facebook … handle their users' posts."  Kern, *Push to reign in social media sweeps the*

---

[8]     Given that the law indicates that users "locat[ed] in [Texas]" should receive "equal access [and] visibility," TCPRC §§143A.001, .002, a service even might face suit if it tried to avoid exposure to Chapter 143A by completely refusing to engage with Texas or Texas-based users—thus confirming that Texas is imposing a nationwide standard for the internet.  Moreover, the law's equal-treatment principle—which is both indefinite and impossible to comply with given the vast amount of content on the internet—appears to control Meta's moderation decisions regarding out-of-state users by tying those decisions to the reference point of any moderation decisions Meta reaches regarding Texas-based users (and vice versa).

*states,* Politico (July 1, 2022), http://perma.cc/A8N7-DALS.  These efforts have produced not only Chapter 143A, but a New York law that seeks to "prohibit[]" "hateful conduct," N.Y. Gen. Bus. Law §394-ccc, and a Florida law that *NetChoice* saw as "very different" from the Texas law.  49 F.4th at 488.  The Commerce Clause, however, ends this battle before it starts by limiting "the autonomy of the individual States [to] their respective spheres" and preventing states from "adopt[ing] similar [social-media] legislation" with "inconsistent" provisions.  *Healy*, 491 U.S. at 335-36.  There is no room under the Constitution for the impending free-for-all over who will control the internet.

Second, even if Chapter 143A somehow only "indirectly" burdened interstate activity, it still would be unconstitutional given its "substantial" harms.  *Edgar*, 457 U.S. at 643 (maj. op).  "The most obvious burden the [law] imposes" comes from the "previously described nationwide reach which purports to give [Texas] the power to determine" the rules for the Nation's internet that is a key "means of interstate commerce" "premised on the lack of territorial limits."  *Id.*; *Barlow*, 568 F.3d at 220; *Admar*, 18 F.4th at 788.  As described, Texas seeks "to block" moderation decisions that social-media services beyond its borders make regarding content and users scattered across all 50 states.  *Edgar*, 457 U.S. at 643 (maj. op.).  Indeed, Davis alleges that "all" such decisions are made in "California."  Compl. ¶13.  And Texas' purported countervailing interest— "to protect resident[s]" from online moderation—is plainly "insufficient to outweigh" the burdens of Chapter 143A.  *Edgar*, 457 U.S. at 644 (maj. op.).  For one thing, this interest is "at variance with [Texas'] asserted legislative purpose" of targeting "West Coast" and "Silicon Valley" companies.  *Id.*; p.4, *supra*.  Moreover, "the State has no legitimate interest in protecting nonresident[s]," yet Chapter 143A imposes "burdens [on] out-of-state transactions" for all of the

17

reasons discussed above.  *Edgar*, 457 U.S. at 644 (maj. op.).  Whatever parochial interest Texas

has in controlling online content, it cannot do so at the expense of everyone else in America.

      <u>Third</u>, the avowed purpose of the law is to target "Silicon Valley" and "West Coast

oligarchs."  *See* p.4, *supra*.  That goal patently violates the Commerce Clause's prohibition on

"discriminat[ion]," offering yet another reason to reject Texas' experiment and the cross-border

strife it seeks to provoke.  *Brown-Forman*, 476 U.S. at 579.

        2.      Granting relief to Davis would violate the First Amendment

          a.      Davis cannot control Meta's editorial judgments

      Texas law cannot dictate what content Meta will disseminate on its privately owned

websites and applications.  The Supreme Court has repeatedly held that the First Amendment

protects "both the right to speak freely ***and*** the right to refrain from speaking at all."  *Wooley v.*

*Maynard*, 430 U.S. 705, 714 (1977) (emphasis added).  This rule prohibits the government from

compelling individuals to "be[] the courier for [the government's own] message."  *Id.* at 717; *W.V.*

*State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  But it also prevents the government from

requiring private entities to disseminate or "associate with" the messages of other private speakers.

*E.g.*, *Pacific Gas & Elec. Co. v. Pub. Utils. Comm'n* ("*PG&E*"), 475 U.S. 1, 4 (1986) (plurality

op.); *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

      Any other approach would infringe the right of private parties to exercise "editorial control

over speech and speakers on their properties or platforms."  *Manhattan Cmty. Access Corp. v.*

*Halleck*, 139 S. Ct. 1921, 1932 (2019).  The Supreme Court's decision in *Tornillo* is instructive.

That case rejected a law requiring newspapers to afford space in their publications to candidates

for political office.  As the Court explained, the "choice of material to go into a newspaper, and

the decisions made as to limitations on the size and content of the paper, and treatment of public

issues and public officials—whether fair or unfair—constitute the exercise of editorial control and

judgment."  *Tornillo*, 418 U.S. at 258.  The challenged law's "intrusion into the function of editors," even apart from any added costs or space constraints imposed on the paper, failed to "clear the barriers of the First Amendment."  *Id.*

     Meta's operation of Facebook and Instagram is entitled to similar protections.  While *Tornillo* addressed a newspaper, the basic premise—that "the editorial function itself is an aspect of 'speech,'" *Denver Area Educ. Telecomms. Consortium v. FCC*, 518 U.S. 727, 737-38 (1996) (plurality op.) (quotation omitted)—is not "restricted to the press"; rather, it applies to "business corporations generally," as well as to "ordinary people engaged in unsophisticated expression." *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 574 (1995).  It is for this reason that a private utility need not include third-party speech in its billing envelopes, *PG&E*, 475 U.S. at 20-21, a parade organizer need not include a group whose values it finds objectionable, *Hurley*, 515 U.S. at 574-76, and a baker likely need not bake a cake with a message he disapproves, *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rights Comm'n*, 138 S. Ct. 1719, 1743-44 (2018) (THOMAS, J., conc. in part and conc. in judgment).

     Meta is no different, especially on the allegations here.  <u>First</u>, Davis apparently seeks to curtail the speech of others when he complains about "fact checks" that question the accuracy of certain videos.  Compl. ¶¶27, 29.  Given that even *NetChoice* would recognize that social-media services are "free to expressly disavow, distance themselves from, or say whatever they want about any expression [a user posts]," surely the First Amendment prohibits Davis from demanding that Meta—or here, "third-party fact-checkers"—suppress their views.  49 F.4th at 462; *see also id.* at 454, 489; Compl. ¶27.

     <u>Second</u>, Davis also would prevent Meta from blocking his "attempt[]" to post a secessionist link, Compl. ¶35, but that sort of "*ex ante* review" "***before*** th[e] content is hosted"—as *NetChoice*

further acknowledged—"typifies 'editorial discretion.'" 49 F.4th at 464-65 (quotation omitted). Indeed, *NetChoice* repeatedly distinguished the facial challenge before it, in which Fifth Circuit believed the "Platforms [had] disclaimed *ex ante* curation," from cases where "platforms … moderate submissions before transmitting them." *Id.* at 465 & n.18; *see also* p.12 & n.5, *supra* (collecting examples).  According to the Fifth Circuit, the latter form of "*ex ante* curation" is "arguably the same [process] that newspapers use for other material they publish and that enjoys constitutional protection," meaning that services should "use[] [an] *ex ante* curation process" if they "want[] the same protections." *Id.* at 465 & n.18.  That is just what Meta allegedly did when it prevented Davis from sharing the link.

Third, Davis suggests that Meta, instead of outright banning his accounts or removing his content, has operated its algorithm in a way that favors other users over him.  Compl. ¶24.  That is a far cry from what *NetChoice* (wrongly) viewed as unprotected "*ex post* censorship" by social-media services that "exercise ***virtually no*** editorial control or judgment," that "do not choose or select material before transmitting it," and that "engage in viewpoint-based censorship with respect to a tiny fraction of the expression they have ***already*** disseminated." 49 F.4th at 459, 465 (emphases added).  Meta's alleged judgments here about the relative prominence that millions (or billions) of its users should have with respect to each other is entitled to First Amendment protection.  *E.g.*, *Tornillo*, 418 U.S. at 258 (protecting "[t]he choice of material … and the decisions made as to limitations on the size and content").  The "concrete application[] of" Chapter 143A to Meta in ***this*** case, *NetChoice*, 49 F.4th at 451, prevents Davis from weaponizing Texas law to nitpick Meta's editorial choices and boost his own prominence over the prominence of others on Meta's services.

Finally, and independently, Meta's alleged decisions in moderating and restricting content are quintessentially expressive, as they convey a message about the type of content and community that Meta finds acceptable.  *See La'Tiejira*, 272 F. Supp. 3d at 991 (recognizing "Facebook's First Amendment right to decide what to publish and what not to publish on its platform.").  The judicial relief Davis seeks, however, would command Meta to "alter the expressive content" of its own message and "becom[e] the courier for [another's] message."  *Hurley*, 515 U.S. at 572-73; *Wooley*, 430 U.S. at 717; *see also NIFLA v. Becerra*, 138 S. Ct. 2361, 2371 (2018).  That would flout the "fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message."  *Hurley*, 515 U.S. at 573; *see also, e.g.*, *Zhang v. Baidu.com*, 10 F. Supp. 3d 433, 436, 439-41 (S.D.N.Y. 2014) ("the Supreme Court['s] … First Amendment jurisprudence all but compels the conclusion that" a plaintiff cannot "punish [a website] for … design[ing] its search-engine algorithms to favor certain expression").  Or, as then-Judge Kavanaugh put it, the law may not "tell Twitter or YouTube what videos to post[,] or tell Facebook or Google what content to favor."  *U.S. Telecom Ass'n v. FCC*, 855 F.3d 381, 435 (D.C. Cir. 2017) (Kavanaugh, J., dis.).  The First Amendment requires nothing less.

        b.    This suit is grounded in content-based, speaker-based, and viewpoint-based discrimination

Allowing this suit to proceed would also endorse discrimination based on speaker, viewpoint, and content, thus triggering strict scrutiny several times over.  *See Reed v. Town of Gilbert*, 576 U.S. 155, 168-70 (2015).  Dismissal is independently required on these bases.

Speaker-based discrimination.  Applying Chapter 143A to Meta would flout the basic "[p]rohibit[ion against] restrictions [that] distinguish[] among different speakers."  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010); *see also Reed*, 576 U.S. at 170.  The Texas law targets disfavored individuals ("Silicon Valley" and so-called "West Coast oligarchs") with

21

gerrymandered size requirements.  *Compare* p.4, *supra*, *with* TCPRC §143A.004(c) (disavowing application to social-media services with fewer than 50 million U.S. users).  Indeed, the Legislature exempted favored businesses, such as smaller social-media services like conservative-preferred Parler and Gab, and excluded the sports, news, and entertainment websites with which the State apparently has no disagreement.  *See* TCPRC §§143A.001(4), .004(c); p.4 & n.1, *supra* (discussing proposed amendment).  It is hard to imagine a law with more obvious speaker-based distinctions.  *See, e.g.*, *Reed*, 576 U.S. at 170 ("[A] law limiting the content of newspapers, but only newspapers, could not evade strict scrutiny simply because it could be characterized as speaker based.").  Such "targeting [of] individual members of [an industry] poses a particular danger of abuse by the State."  *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 228 (1987).

        <u>Viewpoint-based discrimination</u>.  A law is viewpoint-based when it regulates "speech based on the specific motivating ideology or the opinion or perspective" at issue.  *Reed*, 576 U.S. at 168 (quotation omitted).  As noted, the Texas Legislature gerrymandered the law to cover businesses with viewpoints the State dislikes, while exempting businesses with viewpoints the State favors.  This "differential treatment" "suggests that the goal of the [law] is not unrelated to suppression of expression," "a goal [that] is presumptively unconstitutional."  *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 585 (1983).

        But one need not even engage in "suggest[ion]":  it is no secret Texas "designed" the law to "target" certain "speakers"—*i.e.*, Meta—"and their messages for disfavored treatment."  *Id.*; *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011).  The "history of the Act's passage" confirms as much.  *NIFLA*, 138 S. Ct. at 2379 (KENNEDY, J., concurring); *see also Sorrell*, 564 U.S. at 564-65; *Reed*, 576 U.S. 164; *Masterpiece Cakeshop*, 138 S. Ct. at 1729; *Minneapolis Star*, 460 U.S. at 580.  The Governor and legislative sponsor repeatedly denounced "Silicon Valley" and "West

22

Coast Oligarchs" for "silenc[ing] conservative viewpoints and ideas," and they made clear that the law aimed to alter that purported balance.  *See* pp.3-4, *supra*.  Such efforts to "level the playing field" in favor of the State's preferred viewpoints are verboten under the First Amendment—and attaching supposed partisan labels only makes matters worse.  *See Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976) (the "concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment"); *Sorrell*, 564 U.S. at 578-79; *PG&E*, 475 U.S. at 20.  Chapter 143A thus "goes even beyond mere content discrimination, to actual viewpoint discrimination," because "it is apparent that [the law] imposes burdens that are based on the content of speech and that are aimed at a particular viewpoint."  *Sorrell*, 564 U.S. at 565.

　　Content-based discrimination.  A law is content-based where it "singles out specific subject matter for differential treatment."  *Reed*, 576 U.S. at 163, 169.  Here, Chapter 143A does not apply to several types of content, such as that which is "the subject of a referral or request from an organization with the purpose of preventing the sexual exploitation of children and protecting survivors of sexual abuse from ongoing harassment.'"  TCPRC §143A.006(a)(2).  Moreover, the law wholly exempts other services that focus on certain types of "content":  namely "news, sports, [and] entertainment."  *Id.* §143A.001(4); Tex. Bus. & Com. Code §120.001(1)(C)(i).  These differentiations between types of "subject matter" present "a paradigmatic example of content-based discrimination."  *Reed*, 576 U.S. at 169.  Indeed, the Supreme Court has squarely rejected the "disturbing use of selective [legislation]" that favored publications "***devoted to … sports***"— just as Chapter 143A does.  *Ark. Writers*, 481 U.S. at 229-31 (emphasis added).

　　To be sure, *NetChoice* addressed similar arguments, including that the law "impermissibly targeted the largest social media platforms."  49 F.4th at 482.  But its reasoning in the facial-

23

challenge context is of little help here.  For example, the Fifth Circuit claimed that the *NetChoice* challengers "present[ed] no real evidence of the Texas legislature's alleged improper motives" and "simply ask[ed the Court] to infer [one]."  *Id.*  But Meta has cited undisputed public evidence—including statements from the Senator who sponsored the law and the Governor who signed it—that Texas sought to punish Meta and similar California services.

c.      Any level of First Amendment scrutiny is fatal

This suit cannot withstand constitutional scrutiny.  Meta's "choice" "not to propound" Davis' content "is presumed to lie beyond the government's power to control,"  meaning that any restriction of that choice is at minimum subject to strict scrutiny.  *Hurley*, 515 U.S. at 575; *Barnette*, 319 U.S. at 633-34.  And the content-based, speaker-based, and viewpoint-based qualities of the law all require strict scrutiny in their own rights.  *Reed*, 576 U.S. at 170.

Davis thus must show that the law is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163, 171.  He cannot.  Indeed, he could not even satisfy intermediate scrutiny, as the law is not "narrowly tailored to serve a significant governmental interest."  *Knowles v. City of Waco, Tex.*, 462 F.3d 430, 433-34 (5th Cir. 2006) (quotation omitted).

As an initial matter, there is no legitimate state interest—let alone a "compelling state interest[]"—at play.  *Reed*, 576 U.S. at 163.  Although Texas has expressed its desire to bolster certain "viewpoints and ideas," *see* pp.3-4, *supra*, this interest is not a proper basis to intrude on the First Amendment rights of private social-media services. Whatever desire the State may have to "ensur[e] that a wide variety of views reach the public," that goal cannot justify compelling private parties to publish speech they do not want to publish or to display content with which they disagree.  *Tornillo*, 418 U.S. at 247-48; *see also id.* at 251 (rejecting requirement that newspaper carry content even though "economic factors … have made entry into the marketplace of ideas served by the print media almost impossible"); *Hurley*, 515 U.S. at 577-78 (a state cannot coopt

24

"an enviable vehicle for the dissemination of [other] views").  The "concept that [the] government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley*, 424 U.S. at 48-49.

Chapter 143A also flunks heightened scrutiny for lack of proper tailoring to "avoid unnecessary abridgement" of Meta's First Amendment rights. *McCutcheon v. FEC*, 572 U.S. 185, 199 (2014) (plurality op.); *accord Minneapolis Star*, 460 U.S. at 592 ("the State's commitment to [its supposed goal] is questionable").  The law is over- and under-inclusive, *i.e.*, non-tailored, in several ways.  It is over-inclusive because the definition of "social media platform" sweeps in large providers regardless of whether they are services for disseminating information and viewpoints. Indeed, it is ***intentionally*** overinclusive because Texas expressly rejected the actual pro-speech option—creating its own service—in favor of punishing and impairing the rights of Meta and private companies like it.  *See* p.4 & n.1, *supra*.  The law is also under-inclusive.  There is no explanation for the arbitrary size requirements that punish Meta while exempting social-media services with a different perceived ideological bent, like Parler and Gab.  *See* TCPRC §143A.004(c); pp.3-4, *supra*.  "Such underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *NIFLA*, 138 S. Ct. at 2376 (quotation marks and brackets omitted).  And here, the "selective [treatment] of certain [platforms] … does not serve [the law's] alleged purpose in any significant way." *Ark. Writers*, 481 U.S. at 232.

3.     Chapter 143A is impermissibly vague

Application of Chapter 143A would also require the Court to curtail Meta's freedoms on the strength of a law that is void for vagueness.  "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  When "speech is

25

involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Id.* at 253-54.  Yet Texas—despite seeking to fundamentally alter the rules of the internet—has not adequately described its own law's reach.  The result of that uncertainty is that this "vague law is no law at all."  *U.S. v. Davis*, 139 S. Ct. 2319, 2323 (2019).

To give just one example, Chapter 143A defines "censor" to include actions that "deny equal access or visibility to … expression."   TCPRC  §143A.001(1).   That requirement is hopelessly indeterminate because, given the sheer volume of content on a covered service (which by definition has 50-million-plus users), it is impossible for services to determine if every single piece of content generated by tens of millions (or billions) of users has "***equal*** access or visibility." *Id.* (emphasis added).  For example, does Meta need to ensure that pages operated by Texas groups are just as visible to New York users as pages operated by New York groups?  Must Twitter stop identifying "trending" tweets?  And must YouTube change its home page to include a link to every video on the site?

This case presents just one example of the problem.  Davis alleges "that Meta has denied equal visibility to [his] Facebook account posts and stories [because] the number of likes ***seems*** unusually low."  Compl. ¶53 (emphasis added).  In other words, he hopes to impose a functionally-impossible, results-based standard of "discrimination" that would expose a social-media service to suit anytime a user believes that she is not as popular as the millions (or billions) of other users on the service.  Far more "precision and guidance are necessary" about what Chapter 143A actually requires before Texas can reshape the internet and create a flood of litigation.  *Fox*, 567 U.S. at 253-54.

### 4.    The Communications Decency Act bars Davis' claims

As explained above, the CDA "authorized" Meta's alleged actions.  *See* pp.10-12, *supra*; TCPRC §143A.006(a)(1).  Davis thus has not pleaded a threshold "violat[ion]" of Chapter 143A,

which defines its very "[a]pplicability" and "[c]onstruction" in terms of federal law.  TCPRC §§143A.004, .006, .007.  But if the Court finds it easier to treat the CDA as preemptive of, instead of integral to, Davis' claims, the CDA would still doubly bar them.  *Cf. NetChoice*, 49 F.4th at 468 n.24 (declining to address whether the CDA preempts Chapter 143A).

    First, subsection (c)(1) allowed Meta to "screen[]" Davis' postings.  *La'Tiejira*, 272 F. Supp. 3d at 993; 47 U.S.C. §230(c)(1).  Doing so falls within the "traditional editorial functions" for which online services enjoy "broad[]" protections.  *Id.* at 992 (collecting cases); *MySpace,* 528 F.3d at 418 (collecting cases); *Facebook, Inc.*, 625 S.W.3d at 94 n.9; *Sikhs for Justice, Inc. v. Facebook, Inc.*, 697 F. App'x 526 (9th Cir. 2017); *Domen*, 433 F. Supp. 3d at 602-03; *Mezey v. Twitter, Inc.*, 2018 WL 5306769, at *2 (S.D. Fla. July 19, 2018); pp.10-11, *supra*.

    Second, subsection (c)(2) authorized Meta to restrict "objectionable" content in Davis' online postings.  47 U.S.C. §230(c)(2); *e.g.*, *Match*, 2022 WL 877107, at *11; *Daniels*, 2021 WL 1222166, at *13; *Word of God*, 205 A.D.3d at 30; *Domen*, 433 F. Supp. 3d at 603-04.  It was Congress' intent "to keep government interference in [Internet communication] to a minimum" in favor of allowing private social-media services to develop tools to police objectionable content. *Domen*, 433 F. Supp. 3d at 600-01 (quotation omitted); 47 U.S.C. §230(a) & (b); p.12, *supra*.

### C.    The Court Lacks Personal Jurisdiction Over Meta

    Separate from the merits, dismissal is necessary for lack of personal jurisdiction.  Hornbook law holds that a Texas court (and thus a federal district court in Texas) may not exercise personal jurisdiction over Meta absent a showing of "certain minimum contacts [with Texas] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quotation omitted).  Those minimum contacts can take the form of "general jurisdiction" or "specific jurisdiction," both of which are absent here.  *Daimler AG v. Bauman*, 571 U.S. 117, 126-27 (2014).

27

1.      Meta is not subject to general jurisdiction

General personal jurisdiction exists only when a defendant's "affiliations with the State are so continuous and systematic as to render it essentially at home [there]." *Id.* at 127 (quotation omitted).  In virtually every instance, a corporation is "at home" solely in "its formal place of incorporation or principal place of business." *Id.* at 139 n.19.  Only "in an exceptional case," such as when a corporation has temporarily relocated its principal place of business, is a corporation subject to general jurisdiction in an additional forum. *Id.* at 139-40 nn.19-20 ("A corporation that operates in many places can scarcely be deemed at home in all of them.").

Davis alleges that Meta is a "foreign corporation whose corporate office is located" in California.  Compl. ¶8.  That much is true—Meta is incorporated in Delaware and headquartered in California.  But Davis identifies no facts and makes no argument establishing that this is an "exceptional" case warranting general jurisdiction.  *Daimler*, 571 U.S. at 128-131 & 139 n.19.  He merely alleges in conclusory fashion that Meta has "continuous and systematic contacts with the State of Texas."  Compl. ¶10.  That is a recitation of a legal standard, not an allegation of fact.  It cannot be that "a forum has jurisdiction over a foreign defendant merely because of its highly interactive and transaction oriented web pages," because "then the same defendant is likely subject to the coercive authority of every state in the union."  *Head v. Las Vegas Sands, LLC*, 298 F. Supp. 3d 963, 978-79 (S.D. Tex. 2018).  General jurisdiction is far more exacting.

2.      Meta is not subject to specific jurisdiction

A court may not assert specific jurisdiction over a nonresident defendant unless the plaintiff shows that "the defendant's suit-related conduct … create[d] a substantial connection with the forum State."  *Walden*, 571 U.S. at 284.  This "substantial connection" "must arise out of contacts that the defendant *himself* creates with the forum State."  *Id.*  It is insufficient that the "defendant[

28

had] contacts with persons who reside there," even if the plaintiff is a resident of the State and litigation there would be "convenien[t for the] plaintiff[] or third parties."  *Id.* at 284-85.

This complaint falls well short of what the Supreme Court requires—as confirmed by several recent federal cases declining to find jurisdiction over social-media services.  All that Davis alleges in conclusory fashion is that his "claim arises out of [Meta's] specific contacts with the State of Texas in censoring [him] in violation of Texas law."  Compl. ¶10.  This approach is what *Walden* rejected, as Davis' theory merely echoes the faulty premise that a plaintiff's efforts to enforce her or his rights in a State is enough to create jurisdiction therein.  *See Walden*, 571 U.S. at 286 (the Supreme Court has "declin[ed] to find personal jurisdiction in a State merely because the plaintiff in a child support action was residing there" (cleaned up and quotation omitted)).  In other words, that a Texas citizen was supposedly harmed cannot establish Texas' jurisdiction over Meta.  This is especially true given that Davis insists that "California [is] the very state from which **all** social media censorship is perpetrated."  Compl. ¶13 (emphasis added).  His claim turns entirely on allegations of wrongdoing in California, so his assertion that the wrongdoing impacted a Texas resident cannot create personal jurisdiction in Texas.

Recent decisions involving online services prove the point:  there is no personal jurisdiction based only on a defendant's website that was "presumably directed at the entire world."  *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 318-20 (5th Cir. 2021).  Sure enough, courts frequently decline to exercise personal jurisdiction over Meta based on its provision and regulation of online services, or on its users' interactions with those services.  *See, e.g.*, *Georgalis v. Facebook, Inc.*, 324 F. Supp. 3d 955, 961 (N.D. Ohio 2018) ("Plaintiff's broad allegation that Defendant deleted content posted by a Facebook user who happens to reside in Ohio also fails to establish … specific jurisdiction in Ohio"); *Gullen v. Facebook.com, Inc.*, 2016 WL 245910, at

*2-3 (N.D. Ill. Jan. 21, 2016) ("plaintiff alleges that Facebook uses [its features] and … software on all uploaded photos, not just those uploaded in or by residents of Illinois"); *Ralls v. Facebook*, 221 F. Supp. 3d 1237, 1244 (W.D. Wash. 2016) ("[P]ersonal jurisdiction over Facebook may not exist simply because a user avails himself of Facebook's services in a state other than the states in which Facebook is incorporated and has its principal place of business."); *Harrison v. Facebook, Inc.*, 2019 WL 1090779, at *4 (S.D. Ala. Jan. 17, 2019) ("Plaintiff's allegations that Facebook failed to delete content that she or her agent, who happen to be residents of Alabama, posted on her Facebook page fail to show 'with reasonable particularity any specific conduct … by [Facebook] that would support an exercise of specific jurisdiction' in Alabama."); *Wells v. Facebook Inc.*, 2019 WL 6894681, at *1, 5 (D. Kan. Dec. 18, 2019) (plaintiff who claimed that Facebook "uploaded internet cookies to [her] social media profiles" failed to show Facebook had sufficient contacts to support personal jurisdiction); *Dennis v. Zuckerberg*, 2017 WL 3873761, at *2 (N.D. Ohio Sept. 5, 2017) (plaintiff failed to show specific jurisdiction).

The same result is required here, especially on Davis' threadbare allegations that focus on his ***own*** conduct and ***own*** connections with Texas—and that expressly situate "all" of Meta's decisions in "California." Compl. ¶13. Bedrock "notions of fair play and substantial justice" are incompatible with subjecting every company that offers an online service to lawsuits in all 50 states simply because its users live in all 50 states. *Walden*, 571 U.S. at 283 (quotation omitted).

## V.  CONCLUSION

The Court should not reach the complaint because Davis sued in the wrong forum. But if the Court does so, it should dismiss the complaint with prejudice.

Dated: May 17, 2023                              Respectfully submitted,

                                                 */s/ Taj J. Clayton, P.C.*

                                                 Taj J. Clayton, P.C.
                                                 State Bar No. 24050427
                                                 Lead Attorney
                                                 **KIRKLAND & ELLIS LLP**
                                                 taj.clayton@kirkland.com
                                                 4550 Travis Street
                                                 Dallas, Texas 75205
                                                 Telephone: 214-972-1757
                                                 Facsimile: 214-972-1771

                                                 Philip M. Cooper*
                                                 State Bar No. 24105621
                                                 **KIRKLAND & ELLIS LLP**
                                                 philip.cooper@kirkland.com
                                                 300 N. LaSalle St.
                                                 Chicago, IL 60654
                                                 Telephone: 312-862-2000
                                                 Facsimile: 312-862-2200

                                                 **pro hac vice*

                                                 *Attorneys for Meta Platforms, Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on all counsel of record via the Court's CM/ECF filing system on this 17th day of May, 2023.  Pursuant to Local Rule CV-5(a)(9), paper copies are being sent contemporarily to Chambers.

                                                 */s/ Taj. J. Clayton, P.C.*
                                                 Taj J. Clayton, P.C.

31