# United States District Court
### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| PAUL DAVIS, | § | |
| | § | |
| *Plaintiff,* | § | Civil Action No. 4:22-CV-01001 |
| | § | Judge Mazzant |
| v. | § | |
| | § | |
| META PLATFORMS, INC., | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court are Plaintiff Paul Davis's Amended Emergency Motion for Remand (Dkt. #16) and Defendant Meta Platforms, Inc.'s Motion to Transfer Venue and/or Sever Under 28 U.S.C. § 1404(a) and Rule 21 (Dkt. #20).[1]  Having considered the motions, the briefs, and the applicable law, the Court finds that Plaintiff's Amended Emergency Motion for Remand (Dkt. #16) should be **DENIED** and that Defendant's Motion to Transfer Venue and/or Sever Under 28 U.S.C. § 1404(a) and Rule 21 (Dkt. #20) should be **GRANTED**.[2]

## BACKGROUND

Plaintiff Paul Davis ("Davis") accuses Defendant Meta Platforms, Inc. ("Meta") of censoring him in violation of Chapter 143A of the Texas Civil Practice & Remedies Code (Dkt. #1, Exhibit 3 ¶ 1).  Davis is an attorney residing in Collin County, Texas, who regularly posts videos to social media platforms in which he discusses "legal topics important to political conservatives"

---

[1] Plaintiff's original petition also named TikTok, Inc. ("TikTok") as a defendant, hence the potential need for severance under Federal Rule of Civil Procedure 21 (Dkt. #1, Exhibit 3 ¶ 7; Dkt. #20 at p. 17).  Plaintiff has since voluntarily dismissed his claims against TikTok and TikTok is no longer a party to this action (Dkt. #45).

[2] Also before the Court is Meta's Motion to Dismiss Under Rule 12(b) (Dkt. #49).  Having determined that this case should be transferred, the Court will leave this motion to the sound discretion of the transferee court.

(Dkt. #1, Exhibit 3 ¶ 17).  Meta operates several online services and applications with billions of users worldwide (Dkt. #20 at p. 7).  Most notable among its online applications are Facebook and Instagram, both of which allow Meta's users to upload and share content to their networks of friends and followers (Dkt. #20 at p. 7).

## I.      Meta's Terms of Service

Every one of the billions of people who use Meta's applications—including Facebook and Instagram—must acknowledge and agree to Meta's terms of service at the time of registration (Dkt. #20, Exhibit 3 ¶¶ 3; 15).  Practically speaking, when a new user creates an account on Facebook or Instagram, they encounter a notice informing them that their registration constitutes an agreement to the application's terms of service and a hyperlink that allows the user to review those terms.  After reviewing and clicking through the hyperlinked notice of the terms of service, the new user then completes their account setup through the online registration process (Dkt. #20, Exhibit 3 ¶ 3).

Since 2005, Facebook's terms of service have featured a provision that makes clear that continued use of Facebook constitutes acceptance of any updates or additions to Facebook's terms of service (Dkt. #20, Exhibit 3 ¶ 7).  Instagram's terms of service have included a similar continued-use provision since at least 2013 (Dkt. #20, Exhibit 3 ¶ 19).

Also featured in the terms of service for both applications are forum-selection clauses specifying that all disputes arising from the terms of service or the user's access to Meta's applications must be resolved in the United States District Court for the Northern District of California or a state court located in San Mateo, California—the county in which Meta is headquartered (Dkt. #20, Exhibit 3).  Facebook's current terms of service, which have been in effect since July 26, 2022, state that:

> You and Meta each agree that any claim, cause of action, or dispute between us that arises out of or relates to these Terms or your access or use of the Meta Products shall be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, cause of action, or dispute without regard to conflict of law provisions.

(Dkt. #20, Exhibit 4 at p. 16). Instagram's current terms of service contain a substantively identical forum-selection clause, which states that:

> For any claim that is not arbitrated or resolved in small claims court, you agree that it will be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County. You also agree to submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim.

(Dkt. #20, Exhibit 39 at p. 8).[3] Both Facebook and Instagram have long included a California forum-selection clause in their terms of service—Facebook first added a forum-selection clause in 2005, while Instagram first added the clause in 2013 (Dkt. #20, Exhibit 3 ¶¶ 6, 18).

## II. Davis's Use of Meta's Platforms

Davis has been a "near daily user" of Meta's platforms since he created his first Facebook account in 2004 (Dkt. #1, Exhibit 3 ¶ 20).[4] Like all Facebook users, Davis agreed to Facebook's terms of service when he created his account (Dkt. #1 ¶ 12). Under the terms of service in effect at the time that he created his account, Davis authorized Facebook to unilaterally modify its terms by posting notice of the modifications on the site (Dkt. #20, Exhibit 3 ¶¶ 12–13). Shortly after Davis created his account, Facebook modified its terms of service to include a continued-use provision (Dkt. #20, Exhibit 3 ¶ 7). Davis regularly used his first Facebook account for over

---

[3] Because the forum-selection clauses contained in Meta's terms of service for both Facebook and Instagram are substantively identical, the Court will refer to them collectively as the "Meta Forum-Selection Clause" for simplicity.

[4] Per Meta's records, Davis actually joined Facebook for the first time on January 3, 2005 (Dkt. #20, Exhibit 20 ¶ 12). That said, because the date on which Davis joined Facebook is of no consequence here, the Court accepts Davis's allegation as true.

fifteen years.  During the period in which Davis maintained and regularly used his first Facebook account, Facebook modified its terms over two dozen times, with each modified version of the terms containing a California forum-selection clause (Dkt. #20, Exhibit 3 ¶ 13).

In 2012, Davis created his first Instagram account under the username @Who_Is_Paul_Davis (Dkt. #1, Exhibit 3 ¶ 14).[5]  As he did when he joined Facebook, Davis agreed to the Instagram terms of service when he created his account (Dkt. #20, Exhibit 3 ¶ 24). The version of Instagram's terms of service in effect when Davis created his account, and all subsequent versions, include a continued-use provision, which states that users accept any new or updated terms by continuing to use Instagram (Dkt. #20, Exhibit 3 ¶¶ 24–26; Dkt. #20, Exhibit 44 at p. 1).  And, during the time that Davis regularly used his first Instagram account, Instagram's terms of service included a California forum-selection clause (Dkt. #3, Exhibit 3 ¶ 25).

Davis's first Facebook and Instagram accounts were deactivated in January 2021 after Davis—a self-described "J6er"[6]—posted a series of videos documenting his participation in the January 6 insurrection at the United States Capitol to his Instagram (Dkt. #1, Exhibit 3 ¶ 14; Dkt. #20 at pp. 8–9).  Shortly after the deactivation of his first accounts, Davis created new Facebook and Instagram accounts under the username @FiredUpTXLawyer (Dkt. #1 ¶ 15).  In creating his new accounts, Davis again agreed to Meta's terms of service for both Facebook and Instagram, which contained California forum-selection clauses (Dkt. #20, Exhibit 6 at p. 12; Dkt. #20, Exhibit 41 at p. 9).

---

[5] There is also a discrepancy about the date on which Davis created his first Instagram account.  Davis alleges that he "first started using Instagram in 2012," but Meta's records indicate that he created his first account in April 2013 (Dkt. #1, Exhibit 3 ¶ 1; Dkt. #20, Exhibit 3 ¶ 25).  As with the discrepancy regarding Davis's first Facebook account, the Court will accept Davis's allegations as true.

[6] In fact, in the bio section of his Instagram, Davis describes himself as a "J6er," meaning a participant in the January 6 insurrection.  *See* Paul Davis (@fireduptxlawyer), INSTAGRAM, https://instagram.com/fireduptxlawyer?igshid (last visited June 20, 2023).

Davis's new Facebook and Instagram accounts are his "primary means" of attracting new clients to his law practice, which Davis alleges is his "sole means of earning a living" (Dkt. #1, Exhibit 3 ¶¶ 15, 70).  Beginning in 2021, Davis began promoting himself and his law firm by posting regular videos and other content to his Facebook and Instagram accounts, in which he discusses "a broad variety of topics related to law and politics from a conservative viewpoint" (Dkt. #1 ¶ 20).  This promotional strategy proved successful for Davis: He gained a significant following—including over 15,000 followers on Instagram—and "[o]ver 90%" of his clients came to him through social media applications, including Facebook and Instagram (Dkt. #1, Exhibit 3 ¶¶ 17–19).

### III.   Meta's Alleged Censorship of Davis's Current Accounts

According to Davis, his ability to attract clients was, however, curtailed when Meta began restricting his Instagram and Facebook accounts and reducing the visibility of his account to other users (Dkt. #1, Exhibit 3 ¶¶ 23–24).  Davis contends that, although his @FiredUpTXLawyer Facebook and Instagram accounts remain active, Meta has suppressed the visibility of his posts and made it difficult for other users to find and follow Davis's accounts or to engage with and share Davis's content (Dkt. #1, Exhibit 3 ¶¶ 24–25).

Davis also alleges that Meta placed labels on Davis's posts declaring them false, arbitrarily removed his followers, and otherwise suppressed his accounts (Dkt. #1, Exhibit 3 ¶¶ 22–29).  Meta's alleged suppression of Davis's accounts, which Davis characterizes as "shadowbanning," has caused a "massive drop" in Davis's new client appointments, thus threatening his sole means of earning a living (Dkt. #1, Exhibit 3 ¶ 70).

In short, because of Meta's alleged censorship, Davis went from being nearly "overwhelmed" by a new client appointment every single business day to struggling to arrange one or two new client appointments a week (Dkt. #1, Exhibit 3 ¶ 70).

## IV.    Procedural History

Given the harm allegedly caused to his practice, Davis initially filed suit against Meta and TikTok and sought emergency injunctive relief in the 471st District Court in Collin County, Texas on November 21, 2022 (Dkt. #1, Exhibit 5).  TikTok removed the case to this Court on the same day (Dkt. #1, Exhibit 6).  Davis voluntarily dismissed the first case and filed the present action in the County Court at Law No. 4 in Collin County on November 23, 2022 (Dkt. #1, Exhibit 3). TikTok again removed the case on the same day that it was filed (Dkt. #1).  TikTok then filed an amended notice of removal on November 28, 2022 (Dkt.  #7).  Meta consented to the removal one day later (Dkt. #10).

In the present case, Davis seeks declaratory and injunctive relief against Meta under Chapter 143A of the Texas Civil Practices and Remedies Code, which prohibits large social media platforms from "censor[ing]" a user based on the user's "viewpoint" (Dkt. #1, Exhibit 3 ¶¶ 49–58).[7]  Davis asks the Court to order Meta to remove all restrictions from his current Facebook and Instagram accounts and to restore his deactivated Facebook and Instagram accounts (Dkt. #1,

---

[7] At present, Chapter 143A is subject to an injunction entered by the United States District Court for the Western District of Texas over a year ago.  *NetChoice, LLC v. Paxton*, 573 F. Supp. 3d 1092, 1117 (W.D. Tex. 2021), *vacated and remanded*, 49 F.4th 439 (5th Cir. 2022).  The Fifth Circuit initially stayed the injunction pending appeal, but the Supreme Court subsequently vacated the stay and reinstated the injunction.  *NetChoice, L.L.C. v. Paxton*, No. 21-51178, 2022 WL 1537249 (5th Cir. May 11, 2022), *vacated sub nom. NetChoice, LLC v. Paxton*, 142 S. Ct. 1715 (2022).  After full briefing and oral argument, the Fifth Circuit vacated the injunction and remanded the case back to the district court for further proceedings.  *NetChoice*, 49 F.4th at 494.  Critically, however, the Fifth Circuit has since stayed the issuance of a mandate.  Order Granting Appellee's Unopposed Motion to Stay Mandate Pending Petition for Writ of Certiorari, *Netchoice v. Paxton*, 49 F.4th 439 (5th Cir. 2022) (No. 21-51178).  In the absence of a mandate, the injunction preventing the Texas Attorney General from enforcing Chapter 143A remains in effect.  *United States v. Jackson*, 549 F.3d 963, 980 (5th Cir. 2008) (noting that a district court judgment remains in effect until a mandate issues).

Exhibit 3 ¶¶ 54–58).  In addition, Davis, who is representing himself *pro se* seeks to recover his attorney's fees under Texas Civil Practice & Remedies Code § 143A.007(b)(1) (Dkt. #1, Exhibit 3 ¶ 76).

Davis first moved to remand this case to state court on November 28, 2022 (Dkt. #6).  But, citing his need to "diligently research[] and brief[]" issues raised in TikTok's amended notice of removal, Davis withdrew that motion on December 14, 2022 (Dkt. #14; Dkt. #23). Davis filed his amended motion to remand on January 2, 2023 (Dkt. #16).  Meta responded on January 17, 2021 (Dkt. #21).  Davis replied on January 23, 2023 (Dkt. #24) and Meta filed its sur-reply on January 30, 2023 (Dkt. #32).

In addition to opposing Davis's motion to remand, Meta moved to transfer this case under 28 U.S.C. § 1404(a) on January 11, 2023 (Dkt. #20).  Davis filed his response on January 24, 2023 (Dkt. #25).  Meta replied on January 31, 2023, and Davis filed a sur-reply on February 7, 2023 (Dkt. #36; Dkt. #39).

## LEGAL STANDARD

### I.    Remand

Any civil action brought in a state court of which the district courts have original jurisdiction may be removed to the district court embracing the place where such action is pending. 28 U.S.C. § 1441(a).  Federal courts are, of course, "courts of limited jurisdiction, possessing only that power authorized by Constitution and statute."  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  Only state court actions that originally could have been filed in federal court may be removed to federal court by the defendant.  *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987) (citing 28 U.S.C. § 1441(a)). So, in an action that has been removed to federal court, a district court is required to remand the

case to state court if, at any time before final judgment, it determines that it lacks subject-matter jurisdiction.  *See, e.g.*, *Gutierrez v. Flores*, 543 F.3d 248, 251–52 (5th Cir. 2008).

As a starting point, a district court must presume that a suit lies outside its limited jurisdiction, and the burden of establishing federal jurisdiction "rests on the party seeking the federal forum."  *Settlement Funding, L.L.C. v. Rapid Settlements, Ltd.*, 851 F.3d 530, 537 (5th Cir. 2017).  Because removal raises significant federalism concerns, federal courts construe the removal statutes strictly and any doubts about removal should be resolved in favor of remand.  *See, e.g.*, *Hamerly v. Tubal-Cain Marine Servs., Inc.*, 62 F. Supp. 3d 555, 557 (E.D. Tex. 2014).

## II.    28 U.S.C. § 1404(a) Transfer

28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  "The underlying premise of § 1404(a) is that courts should prevent plaintiffs from abusing their privilege under § 1391 by subjecting defendants to venues that are inconvenient under the terms of § 1404(a)."  *In re Volkswagen of Am., Inc. ("Volkswagen II")*, 545 F.3d 304, 313 (5th Cir. 2008).

For the ordinary § 1404(a) motion, the Court makes a threshold inquiry into "whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed," or whether all parties have consented to a particular jurisdiction.  *In re Volkswagen AG ("Volkswagen I")*, 371 F.3d 201, 203 (5th Cir. 2004)).  The Court then considers the propriety of transfer based on the convenience of the parties (referred to as the "private interest factors") and various public interest considerations (the so-called "public interest factors").  *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 63 (2013).

"The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum." *Id.* In determining whether to transfer a case under a forum-selection clause, the Court first determines whether the forum-selection clause is mandatory or permissive. *Weber v. PACT XPP Tech., AG*, 811 F.3d 758, 770–71 (5th Cir. 2016). The Court then decides whether the forum-selection clause applies to the dispute at hand, which involves two separate determinations: (1) whether the forum selection clause is valid, and (2) whether the particular case falls within the scope of the forum-selection clause. *Id.* at 770.

The Court then turns to the issue of enforceability. Forum-selection clauses are presumptively valid and should be enforced "unless [the party opposing enforcement] could clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972); *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593–95 (1991) (noting that forum-selection clauses are presumptively valid even absent arm's-length bargaining); *Haynsworth v. The Corp.*, 121 F.3d 956, 962–63 (5th Cir. 1997). The party resisting transfer therefore bears the "heavy burden" of showing that enforcement of the clause would be unreasonable under the circumstances. *See, e.g.*, *Weber*, 811 F.3d at 773–74; *Haynsworth*, 121 F.3d at 962–63.

Ultimately, if the forum selection clause is valid and enforceable, district courts are required "to adjust their usual § 1404(a) analysis in three ways." *Atl. Marine*, 571 U.S. at 63. First, the plaintiff's choice of forum carries no weight. *Id.* Second, the court "must deem the private-interest factors to weigh entirely in favor of the pre-selected forum." *Id.* at 64. That is, the court may consider arguments only about public interest factors. *Id.* Because the public interest factors will rarely defeat a motion to transfer, "forum-selection clauses should control except in

9

unusual cases."  *Id.*  Third, the transferee venue—that is, the pre-selected forum—will not carry with it the original venue's choice of law rules.  *Id.*

## ANALYSIS

Before turning to the substance of the parties' motions, the Court must first decide which motion to prioritize.  Meta contends that the Court should exercise its discretion to decide Meta's motion to transfer before addressing the motion to remand (Dkt. #21 at p. 14).  Conversely, Davis contends that the Court must first decide the issue of remand before turning to venue (Dkt. #25 at p. 2).

It is axiomatic that a district court must consider subject-matter jurisdiction as a threshold issue in every case.  *See, e.g.*, *Stump v. Barnhart*, 387 F. Supp. 2d 686 (E.D. Tex. 2005) ("Subject-matter jurisdiction must be established as a threshold matter, inflexibly and without exception"); *Pharos Cap. Grp., LLC v. Nutmeg Ins. Co.*, 999 F. Supp. 2d 947, 952 (N.D. Tex. 2014).  So, when presented with both a motion to remand and a motion to transfer, a district court will typically prioritize the motion to remand.  *Id.*

Courts in the Fifth Circuit have, however, identified a set of limited circumstances that weigh in favor of departing from the typical order of operations and ruling on a motion to transfer before deciding a motion to remand when: (1) a suit is already pending in the transferee district; (2) the remand motion will not suffer as a result of the transfer; and (3) transfer would permit the court who would ultimately try the case to rule on the remand motion.  *Oldham v. Nationwide Ins. Co. of Am.*, No. 3:14-CV-00575, 2014 WL 3855238, at *4 (N.D. Tex. Aug. 5, 2014).  But this case has no related suits pending in the Northern District of California, and Meta does not present any circumstances that would compel the Court to forego a jurisdictional analysis.  *See Pharos*, 999 F. Supp. 3d at 952.

Thus, the Court will begin its analysis with Davis's motion to remand.  That said, having determined that remand is unwarranted, the Court will then turn to Meta's motion to transfer.

## I.     Davis's Motion to Remand

Davis seeks to remand this case to state court, arguing that subject-matter jurisdiction is lacking (Dkt. #16 at p. 2).  In removing this case, TikTok and Meta invoked both the Court's diversity jurisdiction under 28 U.S.C. § 1332 and its federal question jurisdiction under 28 U.S.C. § 1331 (Dkt. #7 at pp. 4–12).  Davis challenges both bases of jurisdiction (Dkt. #12 at pp. 2–4).  Davis argues that diversity jurisdiction is lacking because the amount-in-controversy does not exceed $75,000 (Dkt. #16 at p. 7).  As for the issue of federal question jurisdiction, Davis argues that there is no actually disputed federal question necessary to the resolution of his Chapter 143A claims and that the exercise of federal question jurisdiction would disturb the balance of federal and state judicial responsibilities (Dkt. #12 at p. 15).

Meta counters that the amount-in-controversy requirement is satisfied because the individual and collective value of both the equitable relief sought by Davis and his likely attorney's fees exceed $75,000, and because Davis seeks hundreds of thousands of dollars in fines and penalties (Dkt. #21 at p. 15).  Meta also argues that Davis's claim under Chapter 143A necessarily raises questions of federal law because "Chapter 143A's private cause of action compels a plaintiff to plead and establish questions of federal law" (Dkt. #21 at p. 25).  The Court finds Davis's arguments regarding diversity jurisdiction unpersuasive and instead concludes that Meta has carried its burden of establishing that the amount-in-controversy requirement is satisfied here.  The Court will address each of Davis's arguments in turn.

Critically, because the Court concludes that it has diversity jurisdiction, it need not turn to the question of federal question jurisdiction.  *See, e.g.*, *Kennard v. Indianapolis Life Ins. Co.*, 420

11

F. Supp. 2d 601, 608 n.5 (N.D. Tex. 2006) ("Because the court finds diversity jurisdiction present in this case, it need not decide the issue of federal question jurisdiction, even though that issue was argued by the parties.").

### A.      The Requirements for Diversity Jurisdiction are Satisfied

Federal courts have original jurisdiction over civil actions in which the parties are completely diverse, and the amount-in-controversy exceeds $75,000.  28 U.S.C. § 1332.  There is no dispute that the complete diversity prong is satisfied here, as Davis is a citizen of Texas and Meta is a citizen of Delaware and California.  *E.g.*, *McLaughlin v. Miss. Power Co.*, 376 F.3d 344, 353 (5th Cir. 2004) ("The concept of complete diversity requires that all persons on one side of the controversy be citizens of different states than all persons on the other side.") (internal quotations omitted).  Rather, Davis moves to remand this case on the ground that Meta cannot establish that the amount-in-controversy exceeds $75,000 (Dkt. #16 at p. 7).

To determine whether the amount-in-controversy requirement is satisfied, the Court must assess the jurisdictional facts as of the time that the complaint is filed, bearing in mind that subsequent events cannot serve to "deprive the Court of jurisdiction once it has attached." *St. Paul Reinsurance Co. v. Greenberg*, 134 F.3d 1250, 1253–54 (5th Cir. 1998).  In the removal context, the Court looks to the sum claimed by the plaintiff in its state court petition, and that claim controls if made in good faith.  *See, e.g.*, *Theriot v. Transamerica Life Ins. Co.*, 354 F. Supp. 3d 713 (E.D. Tex. 2017).  Removal is proper if it is "facially apparent" from the plaintiff's state court petition that the claim or claims asserted exceed the jurisdictional amount.  *Allen v. R & H Oil & Gas Co.*, 63 F.3d 1326, 1335 (5th Cir. 1995).  When it is facially apparent that the amount in controversy likely exceeds $75,000, remand is not warranted unless the plaintiff establishes "to a legal certainty that the claim is really for less than the jurisdictional amount."  *St. Paul Mercury Indem. Co. v.*

*Red Cab Co.*, 303 U.S. 283, 289 (1938).  Courts typically consider statutory damages, penalties, punitive damages, and attorney's fees in determining the amount-in-controversy.  *Theriot*, 354 F. Supp. 3d at 719 (citing *Greenberg*, 134 F.3d at 1253).

Meta contends that, on the face of Davis's state court petition, the value of the equitable relief sought by Davis, his demand for attorney's fees, and the statutory penalties available under Chapter 143A, both independently and in combination, satisfy the amount-in-controversy requirement (Dkt. #21 at pp. 15–23).  With respect to the value of Davis's claims for equitable relief and attorney's fees, the Court agrees with Meta.

### 1.      The Value of Davis's Claims for Equitable and Declaratory Relief

When, as here, a plaintiff seeks declaratory or injunctive relief, it is "well established" that the amount-in-controversy is measured by "the value of the object of the litigation."  *Farkas v. GMAC Mortg., L.L.C.*, 737 F.3d 338, 341 (5th Cir. 2013) (per curiam) (quoting *Hunt v. Wash. State Apple Adver. Comm'm*, 432 U.S. 333, 347 (1977)).  Put differently, in an action for declaratory and injunctive relief, the amount-in-controversy is the "value of the right to be protected or the extent of the injury to be prevented."  *Leininger v. Leininger*, 705 F.2d 727, 729 (5th Cir. 1983).

The purpose of the injunctive and declaratory relief sought by Davis—to prevent Meta from further censoring Davis and otherwise restricting his ability to attract clients to his law practice—establishes that Davis's right to use Meta's platforms to promote his law practice is the object of this litigation.  *Cf. Farkas*, 737 F.3d at 341.  And Davis's claimed injury is the considerable negative impact that Meta's alleged censorship has had on his practice, which has caused him pecuniary harm and threatened his "sole means of earning a living."  *Cf. Leininger*, 705 F.2d at 729.

13

In this context, the Fifth Circuit takes a "common sense" approach to determining whether a removing defendant has met its burden with respect to the amount-in-controversy. *See Allen*, 63 F.3d at 1336.  Applying that common sense approach to the claims presented on the face of Davis's state court petition, the Court concludes that the value of the object of the litigation and the extent of the injury that Davis seeks to prevent likely exceeds the amount-in-controversy threshold "[u]nder any reasonable basis." *Farkas*, 737 F.3d at 341.

Davis seeks to prevent further censorship and restrictions on his use of Meta's platforms, the means by which he previously attracted "[o]ver 90%" of his clients to his law practice at a standard hourly rate of $250 an hour (Dkt. #1, Exhibit 3 ¶ 17; Dkt. #16, Exhibit 1 ¶ 2).  Although Davis's complaint omits some facts that could be useful in determining the exact value of the damage to Davis's business allegedly caused by Meta (*e.g.*, the number of new client appointments he arranged through Facebook and Instagram, how many of those potential clients actually retained him, how many hours he worked for those clients), the amount-in-controversy analysis "does not require exactness"—it merely requires that the Court determine whether the amount-in-controversy is "likely to exceed the jurisdictional amount." *Davalos v. Allstate Fire & Cas. Ins. Co.*, 522 F. Supp. 3d 240, 247 (W.D. Tex. 2021) (quoting *Allen*, 63 F.3d at 1336).  And, given the extensive and readily quantifiable nature of the harm alleged by Davis, the Court finds that the amount-in-controversy is likely satisfied based on the allegations on the face of Davis's state court petition.

To defeat removal, Davis now argues that the irreparable pecuniary harm alleged in his complaint was speculation, and that "such harm has not materialized" as his firm continues to operate at full capacity (Dkt. #24 at p. 3).  This argument fails to move the needle on remand for two reasons.

First, it is well-established that jurisdictional facts are determined at the time of removal, and that post-removal events do not affect properly established jurisdiction.  *See, e.g.*, *Louisiana v. Am. Nat. Prop. Cas. Co.*, 746 F.3d 633, 636 (5th Cir. 2014).  This case was removed on the same day that Davis filed his state court petition, and, as a result, the jurisdictional facts established on the face of that petition control (Dkt. #1).  And, as noted above, the facts alleged on the face of Davis's state court petition establish that the amount-in-controversy requirement is likely satisfied here.  Davis cannot circumvent removal now by backtracking away from those allegations.  *See, e.g.*, *Cavallini v. State Farm Mut. Auto Ins. Co.*, 44 F.3d 256, 264–65 (5th Cir.1995) (recognizing that removal jurisdiction is determined based on the complaint at the time of removal).

Second, the Court finds Davis's attempt to argue against the facts contained in his state court petition, which he signed under penalty of perjury, to be "somewhat disingenuous if not totally spurious." *Foret v. S. Farm Bureau Life Ins. Co.*, 918 F.2d 534, 538 (5th Cir. 1990).  In support of his requests for emergency injunctive and declaratory relief, Davis specifically alleged that he had suffered pecuniary harm because of Meta's alleged censorship, including significant harm to his law firm (Dkt. #1, Exhibit 3 ¶ 70).  The Court presumes that these allegations were necessarily concrete, as, under Texas law, "hypothetical and speculative" claims cannot support a request for injunctive or declaratory relief.  *See, e.g.*, *City of Plano v. Hatch*, 584 S.W.3d 891, 902 (Tex. App.—Dallas 2019, no pet.).  Consequently, Davis cannot now recast those allegations as mere speculation in a transparent and disingenuous attempt to avoid this Court's jurisdiction.  *See Foret*, 918 F.2d at 538; *Addo v. Globe Life & Acc. Ins. Co.*, 230 F.3d 759, 762 (5th Cir. 2000) (observing the importance of "discourag[ing] disingenuous pleading" by plaintiffs to avoid removal).  For these reasons, the Court finds that the "value of the object" of this litigation independently satisfies the amount-in-controversy requirement.

### 2.    Attorney's Fees

The propriety of removal is bolstered by Davis's request for attorney's fees.  In the Fifth Circuit, it is well-settled that attorney's fees are a part of the amount-in controversy "when they are provided for by contract or by state statute."  *E.g.*, *Foret*, 918 F.2d at 537 (quoting 14A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3712 (2d ed. 1985)).  Davis brings this case under a statute that explicitly provides for "costs and reasonable and necessary attorney's fees."  TEX. CIV. PRAC. & REM. CODE § 143A.007(b)(1).  Neither party disputes that Davis, a licensed attorney who is representing himself *pro se*, can recover attorney's fees under Texas law.  *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 488 (Tex. 2019) (noting that an attorney can recover attorney's fees for *pro se* representation if the fee-awarding statute does not require the party to "incur" fees).

Davis contends, however, that he will not incur more than $75,000 in attorney's fees in this case (Dkt. #16 at pp. 7–8).  But this argument misunderstands the focus of the amount-in-controversy analysis—the question is not whether Davis's attorney's fees alone will exceed $75,000; it is whether the total amount-in-controversy, including the value of Davis's injunctive and equitable relief *and* his claim for attorney's fees, exceeds $75,000.  *Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002) (noting that, if a state statute provides for attorney's fees, "such fees are included *as part of* the amount in controversy") (emphasis added).

And, as Meta points out, it is highly likely that Davis will accrue substantial attorneys' fees in litigating this case (Dkt. #21 at p.13).  After all, Davis has already stated that this case has required multiple rounds of "diligent[] researching and briefing" at Davis's standard hourly rate of $250 an hour (Dkt. #14 at p. 1).  Indeed, if Davis spends even a hundred hours working on this

case at his standard rate, he will accrue $25,000 in attorney's fees—nearly one-third of the amount-in-controversy.  When coupled with the value of the object of this litigation, the Court therefore concludes that the amount-in-controversy requirement will likely exceed $75,000.  *Manguno*, 276 F.3d at 723 (noting that the amount-in-controversy requirement is satisfied when "it is apparent from the face of the petition that the claims are likely to exceed $75,000").[8]

Accordingly, the Court concludes that Meta has carried its burden of establishing that the amount-in-controversy requirement is satisfied based on the allegations presented on the face of Davis's state court petition.  As a result, the Court finds that it has subject-matter jurisdiction and that Davis's motion to remand should be denied.

## II.    Meta's Motion to Transfer

Meta asks the Court to transfer this case to the United States District Court for the Northern District of California under 28 U.S.C. § 1404(a) (Dkt. #20).  In considering whether to transfer a case under § 1404(a) when, as here, there is a forum-selection clause, courts in the Fifth Circuit apply a three-step process.  *PCL Civil Constructors, Inc. v. Arch Ins. Co.*, 979 F.3d 1070, 1074 (5th Cir. 2020).

First, courts interpret the forum-selection clause to determine whether it is mandatory or permissive, whether it is valid, and whether the parties' dispute falls within the scope of the clause. *Id.* at 1073.  This interpretation is governed by state law, which is determined based on the original forum state's choice-of-law rules.  *Weber*, 811 F.3d at 770.

If the court determines that the forum-selection clause is mandatory and valid, and that the parties' dispute falls within the scope of the clause, the court then moves to the second step and

---

[8] Having determined that the amount-in-controversy requirement is satisfied based on Davis's claims for equitable and injunctive relief and his claim for statutory attorney's fees, the Court need not address Meta's argument that potential fines under Chapter 143A should factor into the amount-in-controversy analysis.

determines whether the clause is enforceable. *Id.* at 773–74. The enforceability of a forum-selection clause is a matter of federal law, and there is a "strong presumption in favor of the enforcement of mandatory-forum selection clauses." *PCL*, 979 F.3d at 1074 (cleaned up). Because of this presumption, a party opposing transfer must satisfy a "heavy burden" of showing that enforcement of the clause would be unreasonable under the circumstances. *Weber*, 811 F.3d at 773–74.

Finally, if the court finds that a forum-selection clause is enforceable, it must determine whether "extraordinary circumstances" weigh against transfer. *Atl. Marine*, 571 U.S. at 62 ("Only under extraordinary circumstances unrelated to the convenience of the parties should a § 1404(a) motion be denied."). In making this determination, the court considers the traditional "public interest" factors set out in *Atlantic Marine*. *Id.* at 64. The party opposing transfer must "bear the burden of showing that public interest factors overwhelmingly disfavor a transfer." *Id.* at 67. "Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 65.

Applying this framework here, the Court concludes that the Meta Forum-Selection Clause is mandatory, valid, and enforceable. Moreover, the Court finds that Davis cannot carry his heavy burden of establishing that this is "one of the rare cases" in which extraordinary circumstances can overcome a valid and enforceable forum-selection clause. *Weber*, 811 F.3d at 776.

## A.    Interpreting the Meta Forum-Selection Clause

The Court begins its analysis by interpreting the Meta Forum-Selection Clause. *Id.* at 770. Although federal law governs the enforceability of forum-selection clauses, their interpretation is a matter of state law. *Id.*; *Fintech Fund, F.L.P. v. Horne*, 836 F. App'x 215, 223 (5th Cir. 2020). Neither party has addressed the law applicable to the interpretation of the forum-selection clause

at issue here.  Ordinarily, the Court would thus begin with a choice-of-law analysis.  *Moates v. Facebook, Inc.*, No. 4:20-CV-00896, 2021 WL 3013371, at *3 (E.D. Tex. May 14, 2021) (noting that, when analyzing a forum-selection clause, "courts must ensure that they apply the proper substantive law at each step").  But, in this case, the interpretation of the Meta Forum-Selection Clause is the same whether the Court applies the law of the original forum state (Texas), or the law required by Meta's terms of service (California).  *See, e.g.*, *Cubria v. Uber Techs., Inc.*, 242 F. Supp. 3d 541 (W.D. Tex. 2017) (noting that contractual analysis related to terms of service agreement was identical under either Texas or California law).  Under either state's law, the Meta Forum-Selection Clause is mandatory and valid, and it encompasses this case.

### 1.    The Meta Forum-Selection Clause is Mandatory

The first interpretive issue that the Court must address is whether the Meta Forum-Selection Clause is mandatory or permissive in nature.  There is a "sharp distinction" between mandatory and permissive forum-selection clauses—only a mandatory forum-selection clause justifies transfer or *forum non conveniens* dismissal.  *Weber*, 811 F.3d at 769.  A mandatory forum-selection clause is one that "affirmatively requires that litigation arising from the contract be carried out in a given forum."  *Id.*

The Meta Forum-Selection Clause requires that "any claim, cause of action, or dispute between [Meta and the user] that arises out of or relates to these Terms or [the user's] access or use of the Meta Products *shall be resolved exclusively* in the United States District Court for the Northern District of California or a state court located in San Mateo County" (Dkt. #20, Exhibit 4 at p. 16) (emphasis added).  Whether it is interpreted under the law of Texas or California, this language makes clear that the Meta Forum-Selection Clause is mandatory.  *See, e.g.*, *In re Automated Collection Techs., Inc.*, 156 S.W.3d 557 (Tex. 2004) (concluding that a forum-selection

clause designating "exclusive forum" was mandatory); *Olinick v. BMG Entm't*, 42 Cal. Rptr. 3d 268, 274 (Ct. App. 2006) (concluding that forum-selection clause with "express language of exclusivity of jurisdiction, specifying a mandatory location for litigation" was mandatory).

## 2.     The Meta Forum-Selection Clause is Valid

Next, the Court must consider the validity of the Meta Forum-Selection Clause.  Although Davis contends that the Clause is void as a matter of public policy under Texas law, this argument goes to its enforceability, rather than its validity.  *Cf. Haynsworth*, 121 F.3d at 963.  Davis does not dispute that, by creating and using his Facebook and Instagram accounts, he voluntarily bound himself to Meta's terms of service.  Nor does he does point to any other issues that would call into question the Meta Forum-Selection Clause's validity.  So, when interpreted under Texas law or California law, the Meta Forum-Selection Clause is valid.  *See, e.g.*, *In re Laibe Corp.*, 307 S.W.3d 314, 316 (Tex. 2010) ("Forum-selection clauses are generally enforceable and presumptively valid."); *Korman v. Princess Cruise Lines, Ltd.*, 243 Cal. Rptr. 3d 668, 675 (Ct. App. 2019) ("[T]he forum-selection clause is presumed valid and will be enforced unless the plaintiff shows that enforcement of the clause would be unreasonable under the circumstances.").  In fact, courts in both states—including this Court—have explicitly blessed the validity of the Meta Forum-Selection Clause.  *Moates v. Facebook, Inc.*, No. 4:21-CV-00694, 2022 WL 2707745, at *5 (E.D. Tex. June 13, 2022), *report and recommendation adopted*, No. 4:21-CV-00694, 2022 WL 2705245 (E.D. Tex. July 12, 2022); *Doe v. Facebook, Inc.*, No. 4:22-CV-00226, 2023 WL 3483891, at *5 (S.D. Tex. May 16, 2023); *Thomas v. Facebook, Inc.*, No. 1:18-CV-00856, 2018 WL 3915585, at *4 (E.D. Cal. Aug. 15, 2018) (noting that "[n]umerous courts have affirmed the validity and enforceability" of Meta's terms of service "and the forum-selection clause contained therein") (cleaned up).

### 3.      This Dispute is Within the Scope of the Meta Forum-Selection Clause

The Court must also determine whether this case falls within the scope of the Meta Forum-Selection Clause.  Under Texas law, this determination requires a "a common-sense examination of the claims and the forum-selection clause to determine if the clause covers the claims." *In re Lisa Laser USA, Inc.*, 310 S.W.3d 880, 884 (Tex. 2010) (internal quotations omitted).  When interpreting forum-selection clauses with "relates to" language, Texas courts interpret those clauses broadly to "encompass all claims that have some possible relationship with the agreement." *J.V. & Sons Trucking, Inc. v. Asset Vision Logistics, LLC*, No. 1:20-CV-00163, 2020 WL 10458645, at *4 (N.D. Tex. Dec. 15, 2020).  Likewise, under California law, a "broad" forum-selection clause is one that contains language encompassing "any claim arising from or related to this agreement." *See Howard v. Goldbloom*, 241 Cal. Rptr. 3d 743, 746 (Ct. App. 2018).  To fall within the scope of a "broad" clause, the dispute between the parties "need only touch matters covered by the contract containing the" forum-selection clause. *See Ramos v. Super. Ct.*, 239 Cal. Rptr. 679, 689 (Ct. App. 2018) (cleaned up).

The Meta Forum-Selection Clause explicitly encompasses "any claim, cause of action, or dispute between [Meta and the user] that *arises out of or relates to* these Terms or your access or use of the Meta Products" (Dkt. #20, Exhibit 4 at p. 16) (emphasis added).  This broad "arises out of or relates to" language applies to Davis's Chapter 143A claims, which relate directly to Meta's terms of service and to Davis's ability to use Meta's products without restriction.  Therefore, this case is within the scope of the Meta Forum-Selection Clause. *J.V. & Sons Trucking*, 2020 WL 10458645, at *4; *Ramos*, 239 Cal Rptr. at 689.

In sum, having interpreted the Meta Forum-Selection Clause, the Court finds that the Clause is mandatory and valid, and that this case falls within its scope.

**B.      The Meta Forum-Selection Clause is Enforceable**

The Court turns next to the issue of enforceability.  In diversity cases like this one, the enforceability of a forum-selection clause is a matter governed by federal law.  *Weber*, 811 F.3d at 769; *Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 301 (5th Cir. 2016).  A valid, mandatory, and applicable forum-selection clause is presumptively enforceable.  *Weber*, 811 F.3d at 773–74.  Thus, the Court's conclusion that the Meta Forum-Selection Clause is mandatory, valid, and applicable requires the Court to find the clause enforceable unless Davis can carry the "heavy burden" of showing that enforcement of the Clause would be unreasonable here.  *See id.*; *Haynsworth*, 121 F.3d at 963.  The enforcement of a forum-selection clause may be unreasonable when:

> (1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement will for all practical purposes be deprived of [her] day in court because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state.

*PCL*, 979 F.3d at 1074 (quoting *Haynsworth*, 121 F.3d at 963).  Davis argues that two of these unreasonableness factors apply here.  Specifically, Davis contends that transfer would practically deprive him of his day in court and that the enforcement of the Meta Forum-Selection Clause would contravene the public policy of the State of Texas (Dkt. #25 at pp. 3–14).  The Court finds each of these arguments unavailing.

**1.      Enforcement of the Meta Forum-Selection Clause Will Not Deprive Davis of His Day in Court**

Davis argues that a transfer to the Northern District of California would effectively deprive him of his day in court (Dkt. #25 at p. 8).  To carry his heavy burden of making such a showing, Davis must demonstrate that, for all practical purposes, the courthouse doors will close to him

upon transfer. *Haynsworth*, 121 F.3d at 963.  A showing of comparatively less convenience or of a personal preference for the original forum cannot carry Davis's heavy burden. *See, e.g.*, *Noble House, L.L.C. v. Certain Underwriters at Lloyd's, London*, 67 F.4th 243, 251 (5th Cir. 2023). Indeed, a transferee forum is only inadequate when transfer would leave the plaintiff with "no remedy at all." *Kempe v. Ocean Drilling & Expl. Co.*, 876 F.2d 1138, 1142 (5th Cir. 1989).

Davis does not argue that any grave inconvenience or unfairness will leave him with "no remedy at all" if this case proceeds in the Northern District of California. *See id.*  Nor can he. Davis will have the same remedies available to him in either court, and a judge sitting in the Northern District of California is capable of applying Texas law.  After all, "Texas state courts and Texas federal courts do not have a monopoly on adjudicating Texas constitutional, statutory, and common law claims." *Moates*, 2021 WL 3013371, at *6.  And federal judges "routinely apply the law of a State other than the State in which they sit." *Atl. Marine*, 571 U.S. at 67.

Instead, Davis posits that he will be unable to prevail on his Chapter 143A claim in California due to what he perceives to be a "left-leaning jury pool and judiciary" (Dkt. #25 at p. 10).  In effect, Davis's argument against transfer centers on his plainly partisan speculation that he will receive a less favorable outcome if this case proceeds before a judge appointed by a president with viewpoints that differ from his own (Dkt. #25 at p. 10).  The Court finds this argument unpersuasive and demeaning to the notions of independence and faithfulness to the law that have underpinned the federal judiciary since this nation's founding. *See, e.g.*, THE FEDERALIST NO. 78 (Alexander Hamilton); Stephen Breyer, *Judicial Independence: Remarks by Justice Breyer*, 95 GEO. L.J. 903, 907 (2007) ("In a word, judicial independence is an essential component of a rule of law, one that is necessary to tie together our Nation of 300 million people of every race, every religion, and every viewpoint imaginable.").

23

To begin with, a party's prediction that the result of a case litigated in the chosen forum might differ from that of a case litigated in the original forum does not factor into the Court's transfer analysis.  *Noble House*, 67 F.4th at 251.  Nor do a party's "predictions of the likelihood of a win on the merits."  *Weber*, 811 F.3d at 774 (noting that "it is the *availability* of a remedy that matters, not predictions of the likelihood of a win on the merits.") (emphasis in original).  And, beyond its legal irrelevance, Davis's argument inappropriately conflates the competence and integrity of a federal judge with the political party of the president that appointed them.  In so doing, Davis ignores the fact that every federal judge takes the same solemn oath to "faithfully and impartially discharge and perform all the duties incumbent [upon] them" under the Constitution and the laws of the United States.  *See* 28 U.S.C. § 453.  As made clear by Chief Justice John Roberts, "[w]e do not have Obama judges or Trump judges, Bush judges or Clinton judges. What we have is an extraordinary group of dedicated judges doing their level best to do equal right to those appearing before them."  Adam Liptak, *Chief Justice Defends Judicial Independence After Trump Attacks 'Obama Judge'*, N.Y. TIMES (Nov. 21, 2018), https://www.nytimes.com /2018/11/21/us/politics/trump-chief-justice-roberts-rebuke.html.  Davis has presented the Court with no reason to doubt that this case will proceed before a judge doing their level best to do equal right to the parties appearing before them in this case.

### 2.    Enforcement of the Meta Forum-Selection Clause Does Not Contravene Texas's Public Policy

Davis also argues that enforcing Meta's forum-selection clause would contravene a strong public policy of the State of Texas (Dkt. #25 at p. 3).  As a general rule, "Texas's strong public policy favoring freedom of contract" compels courts to "respect and enforce the terms of a contract that the parties have freely and voluntarily entered."  *Phil. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 471 (Tex. 2016).  This strong public policy extends to the enforcement of forum-selection

clauses.  *See, e.g.*, *In re Nationwide Ins. Co. of Am.*, 494 S.W.3d 708, 712 (Tex. 2016) ("Contractual forum-selection clauses are generally enforceable in Texas.").  And yet, Davis contends that this case presents the rare situation in which Texas's public policy weighs against the enforcement of the Meta Forum-Selection Clause, arguing: (1) that Chapter 143A prohibits the enforcement of forum-selection clauses, (2) that the Meta Forum-Selection Clause is a contract of adhesion, and (3) that Davis could not have contemplated this dispute at the time that he agreed to Meta's terms of service.  The Court finds that none of these arguments allow Davis to carry his "heavy burden" of establishing that the Meta Forum-Selection Clause is unenforceable.  *See Weber*, 811 F.3d at 773–74.

### a.      Chapter 143A Does Not Prohibit the Enforcement of the Meta Forum-Selection Clause

According to Davis, the plain language of § 143A.003 prohibits the enforcement of the Meta Forum-Selection Clause (Dkt. #25 at p. 3).  In its current form, § 143A.003 states that:

> A waiver or purported waiver of the protections provided by this chapter is void as unlawful and against public policy, and a court or arbitrator may not enforce or give effect to the waiver, including in an action brought under Section 143A.007, notwithstanding any contract or choice-of-law provision in a contract.

TEX. CIV. PRAC. & REM. CODE ANN. § 143A.003(a).  As Meta points out, this language says nothing about forum-selection clauses.  To be sure, § 143A.003 expresses the Texas Legislature's desire to secure the substantive protections of Chapter 143A against choice-of-law agreements.  But "even where Texas statutory provisions specify the application of Texas law, these provisions are irrelevant to the enforceability of a forum-selection clause where no statute 'requires suit to be brought or maintained in Texas.'"  *In re AutoNation, Inc.*, 228 S.W.3d 663, 669 (Tex. 2007) (quoting *In re AIU Ins. Co.*, 148 S.W.3d 109, 114 (Tex. 2004)).  Considering Texas's strong public policy in favor of the freedom of contract, the Supreme Court of Texas has set a high bar for

rendering forum-selection clauses unenforceable: "[A]bsent a *statute requiring suit to be brought in Texas*, the existence of statutory law in an area [does] not establish such Texas public policy as would negate a contractual forum-selection provision."  *In re Lyon Fin. Servs., Inc.*, 257 S.W.3d 228, 234 (Tex. 2008) (citing *In re AutoNation*, 228 S.W.3d at 669) (emphasis added).  And, although there are no magic words that establish a state's strong public policy, "statutes found to evince a policy against forum-selection clauses in certain contracts use the terms 'forum' and 'venue.'"  *Al Copeland Inves., L.L.C. v. First Specialty Ins. Corp.*, 884 F.3d 540, 544 (5th Cir. 2018).

Neither term can be found in the current iteration of Chapter 143A, and nothing in the statute expressly requires suit to be brought in Texas courts.  Not only does Chapter 143A contain no language requiring suit to be brought in Texas courts, but it expressly contemplates at least one type of forum-selection clause—§ 143A.003(a) indicates that parties can resolve disputes through arbitration, and an arbitration agreement is nothing more than "another type of forum-selection clause."  *In re AIU Ins. Co.*, 148.  The Court therefore finds that nothing in Chapter 143A establishes a public policy against the enforcement of forum-selection clauses.

This finding is supported by the Texas Legislature's recent decision to add an entirely new section "relating to venue" to Chapter 143A.  *See* Tex. S.B. 1602, 88th Leg., R.S. (2023).  The Legislature specifically recognized that the current and effective version of Chapter 143A "[does] not specify a venue for these actions."  Tex. S. Comm. on Jurisprudence, Bill Analysis, Tex. S.B. 1602, 88th Leg., R.S. (2023).  And so, Senate Bill 1602, which will take effect as Texas Civil Practice and Remedies Code § 143A.0035 on September 1, 2023, requires any action under Chapter 143A to be "brought and maintained in a court in this state," notwithstanding any forum-selection clause.  Act of May 29, 2023, 88th Leg., R.S., ch. 289, § 1, 2023 Tex. Sess. Law Serv.

(to be codified at TEX. CIV. PRAC. & REM. CODE ANN. § 143A.0035).  Notably, however, this provision expressly applies "only to an action filed on or after" September 1, 2023, and is thus inapplicable here.  *Id.* § 2.

The Texas Legislature's addition to Chapter 143A—and the legislative history accompanying the bill—only highlights the fact that the version of the statute under which Davis brings this case is silent on the issue of venue.  *Cf. Emergency Health Ctr. at Willowbrook, L.L.C. v. UnitedHealthcare of Tex., Inc.*, 892 F. Supp. 2d 847, 855 (S.D. Tex. 2012) (noting that, under Texas law, "when the legislature enacts an amendment, [a court] may presume that it thereby intended to change the original act").  Of course, the addition of § 143A.0035 reflects the Texas Legislature's desire to keep future cases brought under Chapter 143A in Texas courts.  But, rather than making the amendment retroactive, the Legislature expressly limited § 143A.0035 "only to [cases] filed on or after" September 1, 2023.  Thus, the Court concludes that Senate Bill 1602 does not override Texas's strong public policy in favor of forum-selection clauses here.

In the end, the Court "look[s] to state statutes and judicial decisions to determine public policy."  *Westchester Fire Ins. Co. v. Admiral Ins. Co.*, 152 S.W.3d 172, 182 (Tex. App.—Fort Worth 2004, pet. denied).   As noted above, the relevant statute here is currently silent on the issue of venue.  That is, there is no current statute "requiring suit to be brought in Texas" under Chapter 143A.  *In re Lyon Fin. Servs.*, 257 S.W.3d at 234.  Accordingly, the Court concludes that Davis cannot point to any "Texas public policy as would negate a contractual forum-selection provision." *Id.*

### b.    Meta's Terms of Service Are Not Unenforceable as a Contract of Adhesion

Davis also argues that Meta's terms of service are a contract of adhesion, and that the forum-selection clause contained in those terms is thus unenforceable as a matter of Texas public

policy (Dkt. #25 at pp. 12–13).  In response, Meta argues that contracts of adhesion are not necessarily unenforceable, and that both the Supreme Court of the United States and the Supreme Court of Texas have upheld forum-selection clauses contained in contracts of adhesion (Dkt. #36 at p. 8).

Even if Davis is correct in classifying Meta's terms of service as a contract of adhesion, this fact alone does not establish a violation of any public policy.  Under Texas law, an adhesion contract is not automatically unenforceable, unconscionable, or void.  *In re AdvancePCS Health LP*, 172 S.W.3d 603, 608 (Tex. 2005); *see also Moates*, 2021 WL 3013371, at *7 (collecting cases).  "The principles of unconscionability do not negate a bargain because one party to the agreement may have been in a less advantageous bargaining position."  *In re Palm Harbor Homes, Inc.*, 195 S.W.3d 672, 679 (Tex. 2006).

In fact, courts regularly uphold forum-selection clauses contained in contracts of adhesion that are not subject to negotiation—even when those clauses are enforced against relatively unsophisticated parties with little to no bargaining power.  *Carnival Cruise Lines*, 499 U.S. at 593 (upholding enforcement of forum-selection clause against unsophisticated cruise ship passengers despite disparity in parties' bargaining power and the fact that contract was not subject to negotiation); *Haynsworth*, 121 F.3d at 965 (enforcing forum-selection clause "notwithstanding the disparity in the parties' bargaining power"); *Burbank v. Ford Motor Co.*, 703 F.2d 865, 867 (5th Cir. 1983) ("That the [forum-selection clause] was part of an adhesion contract is not, standing alone, reason to cast it aside.").

As a practicing attorney, Davis is more sophisticated than many of the individual consumers against whom forum-selection clauses are regularly enforced.  *See Carnival Cruise Lines*, 499 U.S. at 593.  For this reason, Davis can hardly claim that the Meta Forum-Selection

28

Clause is unduly surprising or oppressive.  Nor can Davis point to a single instance of a court finding the Meta Forum-Selection Clause invalid as a product of a contract of adhesion.  On the contrary, courts around the country have uniformly upheld Meta's forum-selection clauses.  *See, e.g.*, *Moates*, 2021 WL 3013371, at *7 (collecting cases); *Franklin v. Facebook, Inc.*, No. 1:15-CV-00655, 2015 WL 7755670, at *2 (N.D. Ga. Nov. 24, 2015) ("[T]he forum selection clause contained [in Meta's terms of service] has been addressed by numerous courts in actions involving [Meta].  The Court cannot identify a single instance where any federal court has struck down [Meta's terms of service] as an impermissible contract of adhesion induced by fraud or overreaching or held the forum selection clause now at issue to be otherwise unenforceable due to public policy considerations.").

In short, Davis cannot show that Meta's terms of service are unconscionable under Texas law and, as a result, the enforcement of the forum-selection clause contained in those terms does not violate Texas public policy.

### c.   The Parties Could Have Contemplated This Dispute at the Time That Davis Agreed to Meta's Terms of Service

Finally, Davis argues that the enforcement of the Meta Forum-Selection Clause would violate Texas's public policy as the parties could not have had the present controversy in mind at the time that Davis agreed to Meta's terms of service (Dkt. #25 at p. 13).  According to Davis, he could not have contemplated the present controversy "[a]t all relevant times where [he] accepted Meta's terms" because he did not know of Chapter 143A until it was introduced August 10, 2021 (Dkt. #25 at p. 13).  This argument suffers from three fatal flaws.

First, the Court is unaware of any instance in which a federal court has held a forum-selection clause unenforceable on the ground that the parties to the agreement did not have the specifics of their controversy in mind at the time of formation.  The language cited by Davis comes

from the Supreme Court's decision in *M/S Bremen*, in which the Court noted that the fact that "the parties did not have the particular controversy in mind when they made their agreement" could factor into "the reasonableness of the [forum-selection] clause." 407 U.S. at 17. "[Y]et even there the party claiming [unenforceability] should bear a heavy burden of proof." *Id.*

Second, and relatedly, Davis fundamentally misunderstands the nature of the term "controversy" as the Supreme Court used it in *M/S Bremen*. The question is not whether the parties could have contemplated the specific statutory vehicle for the claim in question; it is whether the parties to the agreement could have foreseen the dispute subject to the forum-selection clause. *See id.* And, at its core, the dispute between Davis and Meta is exactly the type of dispute that the parties had in mind when they made their agreement. Ultimately, irrespective of the statutory vehicle, Davis's claim arises from Meta's alleged restrictions on his ability to freely access and use his accounts. Meta's terms of service expressly contemplate this type of dispute—after all, the Meta Forum-Selection Clause refers to disputes that arise from or relate to a user's "access or use of Meta's products" (Dkt. #20, Exhibit 4 at p. 16).

Finally, because of the continued-use provision contained in Meta's terms of service, Davis has repeatedly agreed to be bound by Meta's terms of service after learning of Chapter 143A and his dispute with Meta (Dkt. #20, Exhibit 4 at p. 13). Consequently, even applying Davis's narrow definition of "controversy," he is simply incorrect in claiming that he could not have foreseen this controversy "[a]t all relevant times where he accepted Meta's terms."

In conclusion, Davis has failed to carry the "heavy burden" of showing that the enforcement of the Meta Forum-Selection Clause would violate the public policy of Texas. *Weber*, 811 F.3d at 773–74. Tellingly, Davis does not point to a single instance in which a court found that the enforcement of a forum-selection clause would contravene Texas public policy. *Cf. Noble*

*House*, 67 F.4th at 252 (noting that "federal courts presumptively must enforce forum-selection clauses").  If anything, Texas has a strong public policy in favor of the enforcement of forum-selection clauses, and the Court sees no reason to depart from that policy here.  *In re AutoNation, Inc.*, 228 S.W.3d at 669.

Because of the strong presumption in favor of enforcing forum-selection clauses, and because Davis has failed to establish that its enforcement would be unreasonable under the circumstances, the Court therefore concludes that the Meta Forum-Selection Clause is enforceable. *Weber*, 811 F.3d at 773–74.

### C.      No Extraordinary Circumstances Weigh Against Transfer Here

Having determined that the Meta Forum-Selection Clause is mandatory, valid, applicable, and enforceable, the Clause must be given "controlling weight" unless Davis can show that this is the "unusual" case in which "extraordinary circumstances" defeat transfer.  *See Atl. Marine*, 571 U.S. at 64; *Weber*, 811 F.3d at 776.  In making this determination, the Court considers the "public interest factors" typically employed in deciding a § 1404 motion.  *Atl. Marine*, 571 U.S. at 64. These factors "justify a refusal to enforce a forum-selection clause only in truly exceptional circumstances."  *Barnett*, 831 F.3d at 809.  At all times, the party opposing transfer bears the burden of showing that the public interest factors "overwhelmingly disfavor" transfer.  *Atl. Marine*, 571 U.S. at 67.

Davis makes no attempt to carry that burden here.  Indeed, Davis's briefing makes no mention of extraordinary circumstances or of the public interest factors (Dkt. #25).  And, in any event, the Court's own analysis of the public interest factors makes clear that this is not the rare case in which "extraordinary circumstances" defeat a valid and enforceable forum-selection clause.  *Atl. Marine*, 571 U.S. at 64.

### 1.     Administrative Difficulties Flowing from Court Congestion

The first of the four public interest factors looks to the administrative difficulties flowing from court congestion.  *Stellar Restoration Servs., LLC v. James Christopher Courtney*, 533 F. Supp. 3d 394, 427 (E.D. Tex. 2021).  This factor "considers not whether transfer will reduce a court's congestion, but whether a trial may be speedier in another district because of its less crowded docket." *Id.* (internal quotations omitted).  Of the four public interest factors, this factor is necessarily "the most speculative," and, as such, it alone should not outweigh the other factors. *Frito-Lay N. Am., Inc. v. Medallion Foods, Inc.*, 867 F. Supp. 2d 859, 871 (E.D. Tex. 2012).

For the twelve-month period ending on March 31, 2023, there were approximately 399 civil cases per judge in the Eastern District of Texas, with a median time of 8.7 months for disposing of civil cases.  *United States District Courts—National Judicial Caseload Profile*, UNITED STATES DISTRICT COURTS, https://www.uscourts.gov/sites/default/files/data_tables/ fcms_na_distprofile0331.2023.pdf (last visited July 14, 2023).  During the same twelve-month period, there were 609 cases per judge in the Northern District of California, with a median time of 7.5 months for disposing of civil cases. *Id.*

This factor generally weighs in favor of the district with fewer cases per judge. *See Frito-Lay*, 867 F. Supp. 2d at 871–72.  That said, courts have also found this factor to weigh in favor of the district with a faster median time for disposition of civil cases. *See Young v. Capital One Bank USA NA*, No. 3:22-CV-00647, 2022 WL 17084387, at *4 (N.D. Tex. Nov. 18, 2022).  Although the Eastern District of Texas has fewer cases per judgeship, the Northern District of California disposes of cases faster on average.  Therefore, this factor is neutral. *See id.*

### 2.      Local Interests in Having Localized Interests Decided at Home

The second public interest factor assesses the local interests implicated in a case, in an effort to "uphold the principle that jury duty is a burden that ought not to be imposed on the people of a community which has no relation to the litigation." *See Stellar Restoration Servs.*, 533 F. Supp. 3d at 428 (cleaned up).  This factor generally weighs in favor of the district in which the acts giving rise to the lawsuit occurred. *Id.* (citing *Metromedia Steakhouses Co. v. BMJ Foods P.R., Inc.*, No. 3:07-CV-02042, 2008 WL 794533, at *3 (N.D. Tex. Mar. 26, 2008)).  For this reason, Texas has a localized interest in a case involving a Texas plaintiff alleging that he suffered harm in this state. *See id.*  At the same time, however, a judicial district has a "strong local interest" in cases involving a corporate party headquartered in that district. *Moates*, 2022 WL 2707745, at *5 (finding that the Northern District of California "has a strong interest" in deciding a case involving Meta, "given that [Meta] is headquartered in California").  And in cases like this one, where a plaintiff accuses a defendant headquartered in another district of taking actions to restrict the plaintiff's First Amendment rights, courts have found this factor to be neutral. *Perez v. Linkedin Corp.*, No. 4:20-CV-02188, 2020 WL 5997196, at *5 (S.D. Tex. Oct. 9, 2020) (finding localized interest factor neutral when Texas-based plaintiff accused California-based defendant of violating plaintiff's First Amendment rights).  Likewise, the Court finds this factor to be neutral here.

### 3.      Familiarity of the Forum with the Law That Will Govern the Case

The third public factor looks to the relative familiarity of the transferor and transferee districts with the law that will govern the case. *See, e.g.*, *Stellar Restoration Servs.*, 533 F. Supp. 3d at 428.  Although the Northern District of California is perfectly capable of applying Texas law, this Court generally has greater familiarity with Texas law. *Id.*; *Coleman v. Brozen*, No. 4:19-CV-

00705, 2020 WL 2200220, at *7 (E.D. Tex. May 6, 2020).  But, given the relative novelty of Chapter 143A, the Court's familiarity with the law involved here is somewhat limited.  As a result, this factor is also neutral.

### 4.   Avoidance of Unnecessary Problems of Conflict of Laws or the Application of Foreign Law

The final public interest factor looks to the likelihood of unnecessary problems of conflict of laws or in the application of foreign law.  *See Coleman*, 2020 WL 2200220, at *7.  There is no indication that this factor is implicated here, and the Court considers it neutral.

To summarize, all four of the public interest factors are neutral here.  As a result, this case falls far short of the rare instance in which the public interest factors "overwhelmingly disfavor" transfer.  *Atl. Marine*, 571 U.S. at 64.

The Court therefore concludes that the Meta Forum-Selection Clause—which ultimately represents the parties' agreement to litigate this dispute in California—must be given "controlling weight," and that this case should be transferred to the United States District Court for the Northern District of California as a result.  *Id.*

### CONCLUSION

It is therefore **ORDERED** that Plaintiff Paul Davis's Amended Emergency Motion for Remand (Dkt. #16) is **DENIED**.

It is further **ORDERED** that Defendant Meta Platforms, Inc.'s Motion to Transfer Venue and/or Sever Under 28 U.S.C. § 1404(a) and Rule 21 (Dkt. #20) is **GRANTED** and it is further **ORDERED** that this case is **TRANSFERRED** to the United States District Court for the Northern District of California.

**IT IS SO ORDERED**.

**SIGNED this 20th day of July, 2023.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE